## MEADE v. UNITED STATES.

1. The claims of American citizens against Spain, for which by the convention (subsequently becoming the treaty) of February 22d, 1819, the United States undertook to make satisfaction to an amount not exceeding $5,000,000 were such claims as, at the date of the convention, were *unliquidated*, and statements of which had been presented to the Department of State, or to the minister of the United States. And within this class, on the said 22d of February, were the claims of the late Richard W. Meade. And this was the only class that the commissioners appointed subsequently, on the ratification of the treaty, to pass upon claims, had power to pass upon.

2. The convention, as signed February 22d, 1819, subject to ratification within six months, though it was not ratified within the time stipulated, was never abandoned, though some expressions in the notification of August 21st, 1819, by the United States to Spain (notifying to that government that after the next day, "as the ratifications of the convention will not have been exchanged," all the claims and pretensions of the United States will stand in the same situation as if that convention had never been made), indicated that the United States might be induced to refuse to carry it into effect.

3. This notification did not, by the non-ratification within the six months, make revocable the power which citizens of the United States, by filing their claims with it, had given their government to make reclamations against Spain in their behalf, nor did Mr. Meade in point of fact revoke the power which he had so given his government.

4. Mr. Meade having subsequently to the appointment of commissioners presented to them his claims, not in an unliquidated form, but in the shape of a debt acknowledged by Spain in a judgment against it given by a royal junta, or special judicial tribunal of that country, made after the above-mentioned notification by the United States, the commissioners properly rejected the claims as thus made. They did not reject his claims in their unliquidated form, and as filed previously to the convention, in the Department of State and with the American minister.

5. The fact that before the said commission rejected the claim of Mr. Meade in the form in which he had presented it—the form, namely, of an award or judgment by a Spanish tribunal for a sum certain—he requested the government of the United States to procure from the Spanish government his original vouchers and evidences of debt, under a clause of the treaty which obliged the Spanish government to furnish, at the instance of the said commissioners, all such documents and elucidations as might be in their possession for the adjustment of the unliquidated claims provided for by the treaty, does not, even assuming that it shows that he meant to present his claims in an unliquidated form, show any cause of action against the United States over which the Court of Claims could exercise jurisdiction.

**6.** The award of the tribunal of the Spanish government in favor of Mr. Meade, made on the 19th May, 1820, was not, in that form, included by the 5th article of the convention of February 22d, 1819, renouncing certain unliquidated claims then existing.

**7.** There having been no evidence in a finding of the Court of Claims that an assurance, which that court found as matter of fact had been given by the minister of the United States at the court of Madrid, to the government of Spain, that a debt due by the last-named government to Mr. Meade would certainly be paid, if a treaty whose ratification had been suspended was ratified, and which treaty was afterwards ratified, was given in pursuance of any instructions from the President or by virtue of any authority from the United States, the said assurance is to be regarded as having been given without authority, and therefore to be held void.

**8.** This court does not agree with the Court of Claims in its opinion that, on the facts found by it, the United States, by the acceptance of the treaty of Spain of February 22d, 1819, and the cession of the Floridas, unincumbered by certain private grants, to a recognition of which as valid our government had objected, appropriated the property of Mr. Meade, and that he acquired a good claim against them for $373,879.88, for which they were not liable legally and judicially except by and through the investigation, allowance, and award of the commissioners appointed under the treaty. But they do agree with that court in the opinion that the decision of the commissioners, dismissing the claim in the form in which it was presented to them, barred a recovery in the Court of Claims on merits. And that the joint resolution of Congress of July 25th, 1866, referring the case back to the Court of Claims after it had been once decided adversely to the claimant, was not a waiver of the bar, and did not allow that court to consider it upon merits irrespectively of the dismissal by the commissioners.

**9.** This court, in conclusion, expresses its regret, that entitled as Mr. Meade clearly was to prove his unliquidated claims before the commissioners he did not do so, and they observe that now the only remedy of his representatives is by "an appeal to the equity of Congress."

APPEAL from the Court of Claims. The case was thus:

Richard W. Meade, of Philadelphia, a native-born citizen of the United States, went to Spain towards the beginning of this century, and became engaged extensively in commerce with that country. He was there during the invasion of the French under Napoleon, and continued to reside there until the year 1821. While so resident he entered into numerous contracts with the Spanish government after the **year 1802,** and before the year 1819, which involved large

amounts of money, and his resources contributed to the support of that government during its contests with the French. By this means Spain became largely his debtor. After the restoration of the King of Spain to the throne, Mr. Meade was seized and imprisoned by order of the government, confined for a long period of time, and finally released only by reason of the active interposition of the government of the United States in his behalf. About the time of his release our government and Spain were in negotiations in regard to claims which citizens of the United States were making upon Spain for wrongs done to them; in which negotiations a cession of the region known as the Floridas to the United States had been proposed. And on the 6th June, 1818, Mr. Meade being then in Spain, addressed a letter to Mr. Adams, our then Secretary of State, informing him of a hint which he had received, that his just claims against the government of Spain, and such further sum as he might advance, might be satisfied by a cession of lands in that region, and desiring to know whether this would interfere with the designs of the United States. In reply to this letter he was informed that no such cession would be recognized if made after a certain date, to be fixed by the contracting parties. Mr. Meade thereupon abandoned the idea of getting satisfaction of his claim by a grant of land, and there being now a prospect that a treaty would be made in which all claims, including his own, would be provided for, he submitted, January 17th, 1819, the claim to the Department of State "for that protection which his government might think proper to grant." The claim, as sent by Mr. Meade to the United States, showed an aggregate of near $400,000.

On the 22d of February, 1819, a treaty was *signed**\* between the United States and Spain, by which the Floridas were agreed to be ceded to the United States, we contracting that all grants made therein by Spain, before January 24th, 1818 (the date when the proposal for cession was made), should be

* 8 Stat. at Large, 258, 260.

confirmed to the persons in the possession; and both parties agreeing that all grants made subsequently to that date should be void. By the 9th article the two governments reciprocally renounced

" All claims for damages or injuries which they themselves, as well as their respective ·citizens and subjects, may have suffered *until the time* of signing this treaty."

In the same article (one which brought Mr. Meade's notices within the treaty), it was specified (Specification 5) that this renunciation extended

" To all claims of citizens of the United States upon the Spanish government, statements of which, soliciting the interposition of the government of the United States, have been presented to the Department of State, or to the minister of the United States in Spain, since the date of the convention of 1802, and until the signature of this treaty."

The 11th article of the treaty opened as follows:

" The United States, exonerating Spain from all demands in future on account of the claims of their citizens to which the *renunciations herein contained extend,* and considering them entirely cancelled, undertake to make satisfaction for the same *to an amount not exceeding five millions of dollars."*

It was agreed that there should be a commission " to ascertain the full amount and validity of those claims;" such commission to " hear, examine, and decide upon the same within three years from the time of their first meeting." And it was agreed further, that " the Spanish government shall furnish all such documents and elucidations as may be in their possession, for the adjustment of the said claims; the said documents to be specified, when demanded, *at the instance of said commissioners."*

*The final ratification of this treaty was limited by its terms to the 22d of August,* 1819.

On the 10th of March, 1819, after the treaty had been **ratified** by the United States, but before it was **ratified** by

Spain, the government of the United States notified to the government of Spain that the article in the treaty which provided that all grants of lands made by Spain in the Floridas after the 24th of January, 1818, should be declared null and void, "had been agreed to on the part of the United States, with a clear understanding that it included certain grants alleged to have been made, in the course of the preceding winter, by the King to the Duke of Alagon, the Count Rostro, and a certain Mr. Vargas," and that the exchange of ratifications must be "with a full and clear understanding" that these were " among the grants thus declared null and void." In point of fact the grants which the United States insisted were by the treaty declared null and void, had been made prior to the 24th day of January, 1818 (the date when the cession was proposed). And upon the notification given by our government, the government of Spain refused to exchange ratifications, alleging that such declaration or understanding, with regard to the intent and meaning of the treaty, would "annul one of its most clear, precise, and conclusive articles." And that government continued to refuse to ratify the treaty until the 22d of August (the limit of time provided for the ratification) had passed.

On the 21st of August, 1819, the United States notified to Spain, that " *after the* 22d *day of the present month*, as the ratifications of the convention of the 22d of February will not have been exchanged, *all the claims and pretensions of the United States*, which, with the spirit of moderation, the love of peace, and *the delusive expectation* that all causes of difference and dispute with Spain would be thereby adjusted and settled, they consented to modify or waive, *will stand in the same situation as if that convention had never been made.*"

*After* the notices above-mentioned had been given by the United States to Spain, and *after* the time for exchanging ratifications of the treaty of 22d of February, 1819, had expired, Mr. Meade proceeded to prosecute his several claims before a royal junta of Spain,* which had been appointed to

---

* A special tribunal or commission, invested with judicial powers, under the laws of Spain.

hear and determine his claims by the government of Spain, *at the solicitation and with the approval of the government of the United States*, expressed before the signing of the treaty of 22d of February, 1819. While the ratifications of the treaty were held in abeyance, as already stated, Mr. Meade refrained from prosecuting his claims before this junta; but after the notices given by the United States to Spain, to wit, on the 31st of August, 1819, and at various times thereafter, he appeared before the junta, and produced, under and in presence of a decision thereof, all his original documents, vouchers, and evidences of debt, and also evidence as to his alleged personal injuries. And on the 19th day of May, 1820, the junta, with the approval of the King of Spain, made a decree, by which it was adjudged that the government of Spain was indebted to him upon his claims and accounts, and for interest on them down to the time of the award, and for his personal injuries, in a sum in gross, given in Spanish money, and equivalent, in the currency of the United States, to $373,879.88. The King of Spain at the same time approved, transmitted, and delivered to Mr. Meade the formal certificate or evidence of such award, which was, by the laws and customs of Spain, final and conclusive upon the respective parties, and possessed all the solemnity and verity of a judgment, and the record thereof, in courts of the common law. Mr. Meade was, however, at the same time, by the junta, *required to*, and did surrender to the government of Spain all his original documents, vouchers, and evidences of debt establishing his claims. These were received by the Spanish government, "cancelled," and carried, in its fiscal department, to the various accounts to which they respectively belonged, and were considered and treated by that government as forever *discharged and merged*. They were never restored to Mr. Meade, nor to his representatives. Immediately after the decree was rendered, the government of Spain and Mr. Meade each duly notified it to the government of the United States, *which government raised no objection to it, but, on the contrary, expressed its approval to both the government of Spain and to Mr. Meade.*

In addition to what immediately precedes (the first four findings, in substance, of the Court of Claims), that court went on to find, in terms, as follows:

*Fifth.*—After the award rendered by the junta, to wit, in August, 1820, the government of Spain *resumed* the consideration of the treaty of 22d February, 1819, and of the demand made by the United States, that the three certain private grants of lands in the Floridas, made by Spain to her own citizens, not included in the terms of the treaty, should be annulled. And the Cortes of Spain, in which body was vested the sole constitutional power to annul such private grants or cessions, refused to annul the same until the United States should agree to pay and discharge in full the indebtedness of Spain to the said Meade, upon the award of the royal junta. And thereupon the United States, by their minister at the Court of Madrid, gave to Spain " a clear and distinct assurance that the debt due to Richard W. Meade would certainly be paid to him by the United States, if the treaty were ratified by the Spanish government, and the cessions (to the Duke of Alagon, and the Count Rastro, and Mr. Vargas) totally annulled." And upon the faith of these assurances the Spanish government annulled such three private cessions, and duly ratified the said treaty, whereby the Floridas, free of, and unincumbered by, these private grants, passed to the United States. And the said Meade duly notified the government of the United States of the assurances given by their minister, and that the Spanish government had acted upon the faith thereof when annulling the private grants and ratifying the treaty, which notice was duly received by the President, and by him transmitted to the Senate while that body was considering the acceptance or re-ratification of the treaty. And the United States, with full notice and knowledge of all the facts and circumstances set forth in this finding, did, on the 19th of February, 1821, accept and assent to the treaty, as ratified by Spain, and became seized and possessed of the Floridas thereby.

*Sixth.*—And the said Meade, at the time the acceptance of the treaty, as ratified by Spain, was under consideration in the Senate, notified the United States that the award of the royal junta was a good and valid certificate or evidence of indebtedness, and that he protested against the same being appropriated by the United States, unless express provision should at the

same time be made for the full payment thereof by them exclusive of any provision which might be made for American claimants, by the terms of the treaty. And he also requested that such award held by him be expressly excepted and excluded from any operation of the treaty, and that he be allowed to seek the payment thereof from Spain. But the United States, on the contrary, against the will and consent of said Meade, did take and appropriate such indebtedness of the Spanish government, and did *relinquish* the same to Spain, and *discharge and release Spain from the payment thereof. And such claim, demand, or award belonging to the said Meade, so taken and appropriated, constituted and was in fact a part of the consideration paid by the United States to Spain for the cession of the Floridas, and the sole consideration paid to Spain by the United States for an annulment of the three private grants.*

The treaty being thus finally ratified, commissioners were appointed in accordance with its terms.  The findings of the Court of Claims give the subsequent history of the case thus:

*Seventh.*—The said Meade, after the taking or appropriation of his property or award by the defendants, as set forth in the sixth finding, did demand payment therefor from the defendants, but was not paid; and, on the contrary, he was *required* to present his demand to the commissioners appointed under and by virtue of the terms of the treaty of 22d of February, 1819. And the commissioners, *upon such award or decree of the royal junta being presented to them,* did refuse to allow *the same;* and, on the contrary, did determine and decide that the only claims against Spain which they had authority to investigate and allow were claims existing prior to the date of the treaty of 22d of February, 1819, and that inasmuch as the award or decree of the royal junta was subsequent to the date of the treaty, they had no authority to investigate or allow it; and the commissioners accordingly did, on the 29th day of May, 1824, reject and dismiss the same.

The next finding had reference to a matter which made another topic in the case. It was thus:

*Eighth.*—As soon as the commissioners notified the said Meade of their determination to reject his demand for the payment of

his award by the royal junta, but before their final decision or rejection of the same, he duly requested, to wit, on the 17th of April, 1823, the defendants to procure from the Spanish government his original vouchers and evidences of indebtedness described in the fourth finding; and the defendants accordingly did request the Spanish government to furnish and transmit the same to them. But the Spanish government did positively refuse to produce and deliver up such vouchers and evidences of indebtedness, upon the ground that the award of the royal junta was a judicial decree, and final and conclusive upon the parties by the laws and customs of Spain, and that the said vouchers were merged therein, and had been given up to and duly filed and credited in the department of finance. And the Spanish government did subsequently assure the defendants that such cancelled vouchers would be given up as requested; but the same never were so produced and given up, and have ever since been and are still held by the government of Spain. And by reason of such refusal and neglect on the part of Spain to deliver up and surrender such vouchers, the commission never considered or allowed the same, nor any portion of the demand of the said Meade. And, on the contrary, the commission allowed the claims of other persons existing prior to the date of the treaty, to an amount in the aggregate of $5,454,545.13. And the defendants thereupon paid away upon such allowed claims pro rata the sum of $5,000,000, being the whole of the amount provided by said treaty and the acts of Congress in furtherance for the liquidation thereof. And on the 8th of June, 1824, after making such awards, the said commission expired.

Being thus unable to proceed further in any way before the commission, Mr. Meade brought the matter before Congress. It was steadily kept before the attention of that body until the establishment of the Court of Claims. After the establishment of the Court of Claims, 11th of February, 1856, the Senate, by resolution, referred the case to that court for adjudication, and on the 17th of October, 1859, a decision was given (by a divided court) adverse to the claim.

At that time the decisions of the court were reported to Congress, and the claim went back and received the further

consideration of Congress. In 1863 the Court of Claims was reorganized by an act of Congress,* which gave it jurisdiction over private claims against the government, " founded upon any law of Congress, or upon any regulation of an executive department, or upon *any contract*, express *or implied*, with the government of the United States;" and subsequently to this, Congress by a joint resolution reciting that doubts were entertained whether the claim of the estate of Mr. Meade was within a section of the said act, resolved " that the said claim be and the same hereby is referred to the Court of Claims for adjudication thereof, pursuant to authority conferred upon said court by any existing law to examine and decide claims against the United States." The court then heard the case anew, and in accordance with the rules laid down by this court regulating appeals from the Court of Claims,† made a finding which was meant to be a finding of facts, and reported also the conclusions in law of the court upon them. The " finding of facts" is given in what precedes. It purported to be made in accordance with the rule of this court which should govern such finding, a rule in these words:

" The facts so found are to be the *ultimate facts* or propositions which the evidence shall establish in the nature of a special verdict, and *not the evidence on which these ultimate facts are founded.*"

Upon the findings of fact as made by it the Court of Claims, as a conclusion of law, decided:

1. That, by the acceptance of the treaty with Spain of 22d February, 1819, and the cession of the Floridas, free of, and unincumbered by, the three private grants, the United States took and appropriated the property of Mr. Meade, and that he thereby, on the 19th of February, 1821, acquired a good and valid claim against them for $373,879.88.

2. That the United States were not liable legally and judicially for such appropriation so taken for the public use,

---

* 12 Stat. at Large, 765.                    † 3 Wallace, 7.

except by and through the investigation, allowance, and award of the commission appointed by the United States, under and in pursuance of the treaty with Spain of 22d of February, 1819, and that the decision of such commission dismissing the same was final and conclusive upon the claimant, and bars a recovery upon the merits in this court.

3. That the joint resolution, 25th July, 1866, referring back this case after the same had been once decided by the former Court of Claims adversely to the claimant, was not a waiver of the said bar, and did not allow this court to adjudge and decide the case upon the merits irrespective of the decision and dismissal by the said commission.

And that judgment should be rendered herein for the defendants, and the petition be dismissed.

From this decree the representative of Mr. Meade took an appeal here.

*Messrs. Bradley and Cushing, for the appellant :*

I. Mr. Meade's submission of his claims upon Spain, to the Department of State, on *the prospect of a treaty's being concluded,* was not an absolute surrender by him to the government of those claims, nor when both the government of Spain and the United States announced, in effect, that the treaty proposed would never be ratified—in other words, that there would be *no* treaty—was he bound forever from prosecuting his claims against Spain.   When, therefore (1st), a treaty was signed but provisionally—the power to ratify being limited in point of time—and when (2d) Spain by refusing to ratify within the time declared that she would not agree to the treaty, and when (3d and finally), on the 21st August the United States notified to her that the expectation of a treaty had proved a " delusive expectation," and that from the next day "all the claims and pretensions of the United States will stand in the same situation as if that convention had never been made,"—a notification which she made operative by an acceptance of the situation—it cannot be doubted that whatever authority had theretofore been given by Mr. Meade to the United States, by filing his claims, became re-

vocable by him.  He now had a right, if he pleased, to pros-ecute his own claims in his own way.

The fact that new negotiations were entered upon after-wards, and that the treaty with a *new* construction of it, in virtue of *new* considerations received by Spain—this being in fact tantamount to a new treaty—was finally and years after-wards concluded, does not affect our position; nor in view of the complete vacation of proceedings at the 23d of August, would our position be affected even if the treaty had been re-ratified, in its first sense.  Mr. Meade's submission we assume, therefore, became revocable.

II. It was actually revoked.  Mr. Meade's act in submit-ting his claims to the tribunal created by Spain on his peti-tion, and *at the instance of the United States*,—a submission made after the expiration of the time limited in the convention for the ratification thereof, and when there was no negotiation between Spain and the United States for the resumption of that convention,—when in point of fact, as is known,—though this is no part of the findings and, therefore, not properly spoken of, Spain had recalled her minister—and when, so far as anything appeared, there was no probability that the treaty would be ratified by Spain—was an actual and com-plete revocation.

Mr. Meade accordingly accepted this condition of things.  And to a tribunal appointed by the Spanish government "at the solicitation and with the approval of the United States, expressed before the signing of the treaty," actually organized before the signature of the treaty was known in Spain, invested with judicial powers under the laws of Spain, and which had been appointed to hear and determine his claims on Spain, he submitted his claims, and by that tribu-nal the amount was adjudicated on the 19th of May, 1820.  When thus passed on and liquidated they were no longer within the jurisdiction of the commissioners.  Our Secretary of State, Mr. Adams, has said: " If anything in human in-tention can be made clear by human language, it is that the claims provided for by the above stipulation, were in the condition as they had been exhibited *at the time of the treaty;*

that the authority and the trust of examining, ascertaining, and deciding their amount and validity, was solely and exclusively committed to the *commissioners.*" He affirms that Mr. Meade's claim, *if comprised at all within the provisions of the treaty,* was as an unsettled claim. But it was not unsettled in any sense whatever, as he himself argued, and the commissioners had no jurisdiction over that subject-matter. The claims which Mr. Meade had at the signing of the treaty, diverse in character, uncertain in validity, and unsettled as to amount, had been merged in the final judgment of a court of competent jurisdiction. Mr. Meade, in fact, came before the commissioners, as the findings show, only because he was "*required*" to present his demand to them. He sought, as is plain by the findings, to make the government pay irrespectively of that commission. The fact that when thus "*required*" to present his claim to the commissioners, he followed up his petition, and got from them an order or call on Spain, under the treaty, to produce the vouchers he had surrendered and which were cancelled, cannot be availed of to support their jurisdiction. No consent of Mr. Meade could give it. The agreement of both parties could not. The answer of Spain to that demand, as set out in the eighth finding, was conclusive "that the award of the royal junta was a judicial decree, and final and conclusive on the parties by the laws and customs of Spain, and that the vouchers were merged therein, and had been given up to be duly filed and credited in the department of finance." The commissioners decided that they had no authority to investigate or allow *such* a claim. They did not decide that the petitioner had no case against Spain, or upon the fund which they were to distribute under the treaty, but that they had no power or authority to investigate or allow *that* claim; that is to say, that they had no jurisdiction over the subject-matter, and they were right.

In this state of things, the claim being formally established at the instance of our government, by the judicial tribunals of Spain, and admitted under the most solemn act as a debt due from Spain, but with no board constituted to

act upon it, the United States, " against the will and consert of said Meade, did take and appropriate such indebtedness of the Spanish government, and did relinquish the same to Spain, and discharge and release Spain from the payment thereof," they, by their minister at the court of Madrid having given to Spain " a clear and distinct assurance that the debt due to Richard W. Meade would certainly be paid to him by the United States, if the treaty were ratified by the Spanish government, and the three private cessions annulled;" and upon the faith of these assurances the Spanish government having annulled these grants, ratified the treaty, and ceded the Floridas to the United States, with an unincumbered title. All this was duly notified to the United States; and " with full notice and knowledge of all these facts and circumstances," on the 19th February, 1821, she accepted and assented to the treaty as ratified by Spain, and received the Floridas.

Did not this transaction take Mr. Meade's case out of the operation of the treaty, even assuming that after the notice of the United States to Spain, of the 21st of August, 1819, and the award of the junta, it was not already outside of it?

And was not this appropriation of his debt so known and admitted, made under an implied, if not an express contract to make compensation therefor?

But if the claim, in any form, after having passed into judgment of the Spanish tribunal, was still within the class of claims that the commissioners had a right to entertain, how stands the case? That Mr. Meade had a just original claim against Spain no one denies. By the approval of his own government he had turned it into *res judicata*, and in doing so had been " required " by Spain to give up to her all the evidences of it. " Required " now by our own government to present his claim to our commissioners, and they having no power to consider it otherwise than independently of and anterior to the judgment of the junta, he calls on our government to request from Spain, as in pursuance of the treaty it secured a right to do, his original vouchers. His purpose was plainly to present it in an unliquidated shape.

It was only for the " adjustment " of claims under the com-
mission that the treaty gave a right to ask for these vouchers.
The request to have the vouchers, was in substance a pre-
sentation of it in this form.   Our government does so call
on Spain for these vouchers, but from want of promptness,
or want of efficiency, or from her having made the term of
the commission too short, or from some other cause connected
with *her* own management or mismanagement of this part
of the thing, the commission expires before the vouchers are
obtained.   The government had undertaken to act as agent
or attorney for Mr. Meade; to manage the whole matter;
and the time to prove the claim in the unliquidated form,
having, as that time was limited by the government, been
too short for her to do her duty in the premises, surely a
claim exists here for reimbursement in some other form.
The case falls within what is said by Lord Chancellor Truro
in *De Bode* v. *The Queen.** "It is admitted law that if the
subject of a country is spoliated by a foreign government he
is entitled to redress through the means of his own govern-
ment.   But if through weakness, timidity, or any other cause
on the part of his own government, no redress can be ob-
tained, then he has a claim against his own country."   And
what is there unjust in this?   The whole sum allowed by
the government ($5,000,000) has been absorbed by other
claims confessedly just.   If Mr. Meade had another claim,
and a just one also, then it is plain that Congress, in appro-
priating but $5,000,000, appropriated a sum insufficient to
satisfy the just claims of American citizens, and should in
some way pay more.

III. Assuming, as the Court of Claims decides it was, that
independently of the joint resolution of July 25th, 1866, the
decision of the commissioners dismissing Mr. Meade's claim
was a bar to recovery upon merits in the Court of Claims,
that joint resolution was a waiver of the bar.   Had the case
been referred in ordinary routine it would have probably
been no bar.   But it went back by the special action of Con-

---

* 3 Clarke, House of Lords, 465.

gress, to whose members it was known as fully as to the members of this court. There never was a case of which Congress had so thorough a knowledge. Nay, Congress had before them the decision of the Court of Claims dismissing the case on this very ground. Must we say that that body which established the Court of Claims for the ends of a great, beneficent, and liberal justice, has specially waived the former judgment of the Court of Claims and specially re-referred the case, only that the court may report its former decision and dismiss it upon a technical ground? This would be to interpose for the United States a defence which it has itself withdrawn.

*Mr. Hoar, Attorney-General, and Mr. Talbot, special counsel for the United States, contra:*

I. The case assumed by the other side, even if it were admitted to be true, does not establish the existence of an act of Congress, a regulation of an executive department of the United States, or a contract of the United States, express or implied, calling for the payment, by the United States, of the sum here claimed. Yet one of these three things must be shown in order to the recovery of a judgment against the government before the Court of Claims.

1. The treaty contains no such contract; its positive provisions exclude such. For, in the first place, the undertaking of the United States to make satisfaction for claims extended only "to an amount not exceeding $5,000,000," and claims to that amount have been paid.

2. The same article which bound the United States to payment also provided for the ascertainment of what should be paid. Those claims were to be paid which the stipulated commission should, within the stipulated term, determine to be valid. Those, and no others; for the treaty was the ultimate source, the first foundation, of the authority of the commission, which was not the creature of mere statute. Its term of office was not a statute term; it was a treaty term. Not its term only, but also its determinations, derived their authority from the treaty. This ends the whole case, so far as obligations to pay are imposed by the treaty.

3. Nor can a judgment of the Court of Claims find lawful basis in the facts stated, as found by that court in the fifth finding. The basis of this finding lies among public National acts—treaties between sovereigns—the construction of which is conclusion of law, and not finding of fact, as in transactions personal, and pertinent to the capacity of private parties. [The learned counsel then went into certain public documents, particularly an official letter of Mr. Adams, our Secretary of State, and some depositions to show that the finding of the Court of Claims, as a finding of fact, was not warranted.]

4. Nor does a taking of private property for public use raise an implied contract for compensation which can be enforced in the Court of Claims. The obligation to compensate for such property, until expressly delegated, rests upon the sovereign, upon Congress, and is not to be assumed by any subordinate branch of the government.

II. The validity of the claim is urged on the ground that the United States neglected to demand or to obtain in season the evidence from Spain, and the right to recover seems to be placed on the ground, that in respect to any claim which the United States undertakes to conduct, they stand in the relation of attorney to the client in the prosecution of that claim, and are responsible for laches under precisely all the stringent rules of common law applicable to the personal relations of client and counsel. But the responsibility of an attorney to his client is founded on the fact that the attorney "undertakes to conduct" the business of his client for pay and compensation, a method in which the United States never undertakes to conduct, with foreign governments, the claims of its citizens. The United States, then, never undertakes to conduct a case in the manner implied by this proposition, and it falls to the ground for want of facts to which it will apply.

Independently of all which the government is **not responsible** for the laches of its officers or agents.*

---

* Gibbons *v.* United States, 8 Wallace, 269.

*Reply.*—I. The government, it turns out, cannot stand upon the findings of fact by the Court of Claims; especially not upon the fifth one. It is compelled to attack them, and to say that that court when professing to find facts really made conclusions of law; and then it goes behind the findings to show error in them. The weakness of the government case is disclosed at once. We deny that the fifth finding is not a finding of facts. Every finding which reports " ultimate facts," instead of reporting by *prouts* and *in his verbis*, the evidence on which those facts rest, might be attacked as not being a finding of fact.* Yet it is precisely this sort of facts, " ultimate facts," that this court, by its general rules, requires the Court of Claims to find and send up to it, and for not finding and sending up which, but for finding and sending up instead the *evidence* of those facts—the sort of thing which the government here argues should be sent up—that in *United States* v. *Johnson*† this court returned the record to the Court of Claims, in order to send things in a cleaner form. This court wants a case, not the evidence from which a case is made up. It has confidence in the ability of the Court of Claims to find the facts; " a tribunal which," as it declared in *United States* v. *Adams*,‡ " must, of necessity, inquire into them fully, and which having ample time, and being otherwise every way competent, may be relied on to state them truly." Certainly it will be conceded that every one of the findings in the fifth finding *may* be a fact. And when the Court of Claims finds each as a fact—finding afterwards, conclusions of law upon them all, as facts—those findings must, now and here, and while the case is a hearing upon the present record, be received as facts. If the government had any objection to the form of the finding, it should have asked the court below to alter the form; or should now ask this court to send it back, as was done in *United States* v. *Johnson*,§ for a better shape. Unreformed it stands as a finding of facts. And a rule of court makes such a finding equivalent to a special verdict, the place of which it supplies

---

* See what is said in United States *v.* Johnson, 6 Wallace, 111.
† 6 Wallace, 111.          ‡ Ib. 110.          § Ib. 112.

If the finding here were a special verdict in fact, would it be tolerated that counsel should go behind it, and by letters of Mr. Adams or Mr. Meade, or depositions, or diplomatic notes, show that the jury had come to a wrong verdict? Standing in the place of a special verdict it stands above attack, and even above criticism.

II. The United States received a valuable consideration from Mr. Meade specifically, for all its engagements, including the one about vouchers. The surrender by Spain of what it regarded as one of "the most precise, clear, and conclusive articles," and the acquisition by the United States of three large tracts of land, whose acquisition was a *sine qua non* of a treaty, was this consideration. It was bound by the highest obligations, therefore, to transact its business efficiently.

The position that the United States, after having received the price of great treaties stipulated for by its plenipotentiaries in dealing with foreign courts, may, with this price unreturned, disregard the engagement of those its high agents, and say that because such officers had no direction to make such stipulations, therefore that they, the government, will not pay for what they have received, and are now enjoying, is one that cannot have been well considered.

Mr. Justice CLIFFORD delivered the opinion of the court.

Private claims against the government of the United States, founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government, are within the jurisdiction of the Court of Claims, as appears by the second section of the act passed to amend the act establishing that court.*

Comprehensive as that provision is, still doubts were entertained whether the claim of the appellant was not excluded from the jurisdiction of the court by the ninth section of the amendatory act, but all doubt upon the subject was removed by the joint resolution subsequently passed, by which Con-

---

* 12 Stat. at Large, 765.

gress, in express terms, referred the claim to that court for adjudication, to be examined and decided in the same manner as other claims against the United States under existing laws.*

I. Pursuant to that authority the appellant, as the representative of the deceased claimant, presented his petition to the Court of Claims, setting forth very fully the nature of his alleged cause of action and the ground upon which he claims to recover in this case. His ancestor, the decedent, was a native-born citizen of the United States. Early in the present century he went to Spain, and while resident there became extensively engaged in commerce with that country. He was there during the invasion of the French under Napoleon, and continued to reside there until the treaty of amity, settlement and limits between Spain and the United States was ratified by both parties. Throughout that period he was constantly engaged in mercantile pursuits, and he also entered into numerous contracts with the government of that country, prior to the date of the treaty, by means of which Spain became very largely his debtor.

Part of his claims consisted of fourteen unliquidated accounts for goods sold and delivered, and it also appears that he was illegally arrested during that period, and that he was imprisoned by the order of the government, for which wrongs and personal injuries he also held large unliquidated claims. Unable to regain his freedom from the unjust imprisonment he sought the aid of the United States, and it appears that it was not until our government interfered that he was released from his confinement. Both before and after the date of the treaty he invoked the aid of the government of the United States in collecting his claims, as well those arising from contracts as those arising from unjust imprisonment and personal injuries.

Prior to the date of the treaty the claimant filed in the office of the Secretary of State a notice of his claims against that government, amounting, as he alleged, to four hundred

---

* 14 Stat. at Large, 611.

thousand dollars, and the finding of the court below shows that the notice so filed was one of the notices referred to and included in the treaty between the two countries.   Reclamations were also made by many other citizens of the United States upon Spain for wrongs and injuries suffered by them through the acts or official orders of that government, notices of which were either filed in the State Department or had been presented to the minister of the United States resident in that country.   Questions of great magnitude also touching treaty obligations previously contracted, the settlement of disputed territorial limits, and the cession of new territorial possessions, were under diplomatic discussion between the plenipotentiaries of the two governments.

Pending these reclamations, and at a moment when the state of the negotiations presented strong hopes that they might terminate successfully, the claimant informed the Secretary of State that it had been intimated to him that if he would advance a further sum of money to that government he might procure a grant of lands in Florida sufficient to cover the whole amount of his claims.   Evidently his purpose was to ascertain whether such a grant, if made, would be sanctioned and respected by the United States in case the then pending negotiations should be successful and Florida should be ceded to our jurisdiction.

II.  Equal and exact justice to all the claimants was what our government was endeavoring to secure by the negotiations, and of course the suggestion received no encouragement whatever, as it contemplated a separate provision for one, to the exclusion of the rest.   On the contrary, the reply of the Secretary was to the effect that if the treaty of cession was concluded it would contain a provision that all grants made after a given date, to be fixed by the contracting parties, should be null and of no effect.   Influenced by that reply he abandoned any further attempt to collect his claims by procuring a grant of land and submitted the same to the State Department "for that protection which his government may think proper to grant."

On the twenty-second of February, 1819, the treaty of

amity, settlement and limits was signed by the respective plenipotentiaries of the two countries, and the Senate of the United States ratified the same on the twenty-fourth of the same month.*

All the territories which belonged to Spain, situated to the eastward of the Mississippi, known by the name of East and West Florida, were agreed to be ceded to the United States in full property and sovereignty, the United States contracting that all the grants of land made therein by Spain, or by her lawful authorities, before the twenty-fourth of January, 1818, the date when the first proposal for the cession was made, shall be ratified and confirmed to the persons in the possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of the former sovereign, but the contracting parties also stipulated, in the same article of the treaty, that all grants made subsequent to that date "are hereby declared and agreed to be null and void."

Animated with a desire of conciliation and with the object of putting an end to all differences existing between them, the contracting parties reciprocally renounced all claims for damages which they themselves or their respective citizens and subjects "have suffered until the time of signing this treaty." Such claims for damages so renounced by the respective parties, on the one side or the other, were classified in the ninth article of the treaty under different heads, but it will not be necessary to refer to any of the classifications with much particularity except to the fifth class renounced by the United States, which releases all claims of our citizens "until the signature of this treaty," statements of which soliciting the interposition of the government of the United States have been presented to the Department of State or to the minister of the United States subsequent to the antecedent convention between the two countries.

Claims to which the described renunciation extends were declared by the eleventh article of the treaty to be entirely cancelled, and the United States contracted, not only to

---

* 8 Stat. at Large, 264; 3 Executive Journal, **177.**

exonerate Spain from all demands in future on account of such claims, but also " to make satisfaction to their citizens for the same to an amount not exceeding five millions of dollars." Subsequent demand by the United States for any such claim was entirely prohibited, and the United States also contracted to appoint three commissioners to ascertain and adjudicate the full amount of all such claims, and the stipulation was that the commisioners should receive, examine, and decide upon the amount and validity of all the claims of citizens of the United States so renounced and cancelled. They were also authorized to hear and examine on oath every question relative to the said claims, and to receive all suitable authentic testimony concerning the same, and the sovereign of Spain contracted to furnish all such documents and elucidations as were in the possession of that government for the adjustment of the claims according to the principles of justice, the law of nations, and the stipulations of the prior treaty between the contracting parties.

III. Viewed in the light of these several suggestions nothing can be more certain than the conclusion that the claims in question, at the time the treaty was signed, were included in its provisions, and " that the authority and the trust of examining, ascertaining, and deciding upon their amount and validity were solely and exclusively committed to the commissioners" to be appointed under the treaty. Beyond question they were at that date unliquidated claims of a citizen of the United States, statements of which, soliciting the interposition of our government, had not only been presented to the Department of State, but also to the minister of the United States, showing to a demonstration that the claims of the ancestor of the appellant were within the very words of the treaty.

Prompt action by the United States in ratifying the treaty did not, however, have the effect to secure corresponding promptitude on the part of the other contracting party. Delay ensued, which for a time was wholly unexplained; but it soon came to be understood that it arose from the fact, that pending the negotiations three grants of large tracts of

land, situated in the ceded territories, had been made, which our government regarded as null and void under the closing provision of the eighth article of the treaty. Determined not to protect those grants, the Secretary of State instructed our minister to explain and declare, upon the exchange of ratifications, that the exchange was made " with a full and clear understanding between the plenipotentiaries of both the high contracting parties that these grants were among the grants thus declared null and void."

On the receipt of that despatch Spain refused to ratify the treaty, and, through her minister sent here for that purpose, objected to that requirement as inconsistent with the treaty, and he insisted that such a declaration, if made, would " tend directly to annul one of its most clear, precise, and conclusive articles." Pending this discussion, the period fixed by the treaty for the exchange of the ratifications expired; but the United States notified the Spanish government the day previous, that if the six months expired without such ratification they should hold themselves free to press and enforce their claims and pretensions in any and every mode consistent with honor that their interests may require.

Confessedly, some of the expressions of that despatch indicated that the United States might, under some circumstances, be induced to refuse to carry the treaty into effect; but they never made any such decision, and never did any act or uttered a sentiment which authorized the claimants interested in its provisions to assume that they had come to any such conclusion. Nothing of the kind was ever intimated by the minister sent here from Spain, and the correspondence which ensued shows conclusively that neither party contemplated any such result. He came for explanations; but he was told, before any reply was given to that part of his communication, that the President wished to be informed whether he was the bearer of the ratifications of the treaty previously signed and committed to the charge of our minister for that purpose. Obliged to answer that inquiry in the negative, he found it necessary to give explanations in behalf of his own government before requiring

any from the United States. Reference is made to that correspondence to show that the treaty as signed was never abandoned by either party, and nothing was ever given or promised by the United States except what is therein stipulated to secure its ratification.

New articles to the treaty were not required by the new minister, and he was emphatically told by the Secretary of State that the United States could not, consistently with what was due to themselves, stipulate any new engagements as the price of obtaining the ratification of the old; that the declaration which our minister was instructed to deliver at the exchange of the ratifications of the treaty with regard to the eighth article, was not intended to annul or in the slightest degree to alter or impair the stipulations of that article; that the only object in view was to guard his government, and all persons interested in any of the annulled grants, against the possible expectation or pretence that those grants would be made valid by the treaty.

Although the Secretary of State informed the minister sent here for explanations that the question of ratification on the part of the United States must be again submitted to the Senate, because the six months had expired, still he insisted that it should be ratified by the other contracting party without delay and without any alterations, showing conclusively that the consummation of the arrangement was both contemplated and desired.*

IV. Power to annul the grants in question, or to declare them null and void, as required by our government, it was insisted by the Spanish negotiators, did not reside in the King alone, that the consent of the Cortes must first be had before the required declaration could be made; and it does not appear that any attempt was made on the part of our government to controvert that proposition. Further delay necessarily ensued, but the consent of the Cortes was given on the fifth of October, 1820, and on the twenty-fourth of the same month Spain ratified the treaty without alteration or amendment.

* 4 American State Papers, 683.

Occurring, as these matters did, in the recess of the Senate, further action was necessarily deferred until the meeting of Congress. By special message the President, on the thirteenth of February, 1821, informed the Senate that the minister of Spain had given notice that he was ready to exchange the ratifications of the treaty, and it appears that the Senate, on the nineteenth of the same month, again consented to and advised the President to ratify it, without making any amendment to the same, or suggesting any qualification whatever to any of its provisions.*

Application had been made by the deceased claimant to the government of Spain, before his claims were transmitted to the State Department, requesting that the King would appoint a commission to liquidate his claims; but, on the seventeenth of January, 1819, when the prospect brightened that a treaty would be concluded, he submitted his claims to the Department of State " for that protection which his government may think proper to grant."

No such commission was appointed until after the minister who signed the treaty had been recalled, and the United States had been informed by his successor that his government regarded the declaration which our minister was instructed to exact, when the ratifications of the treaty should be exchanged, as tending " directly to annul one of its most clear, precise, and conclusive articles." Reluctant to make the required declaration, Spain recalled her minister and " suspended the ratification of the treaty;" and on the seventh of May, 1819, she appointed the commission previously requested by the claimant, and it appears that the commission in eleven days afterwards informed the claimant that they were prepared to receive his proofs and hear his explanations.†

They, the commissioners, proceeded promptly to the discharge of their duties, and on the thirty-first of August following they notified the claimant to produce the documentary evidences to support his claims, and it appears that he,

---

* 3 Executive Journal, 244.

† Meade v. United States, 2 Nott & Huntingdon, 256.

in the course of a few weeks, transmitted the originals to the commission. Perfect success attended his efforts, as the commission, with the express and formal approval of the King, on the nineteenth of May, 1820, made an award in his favor for the sum of three hundred and seventy-three thousand eight hundred and seventy-nine dollars and eighty-eight cents, in our currency, which included his fourteen unliquidated contract claims, with interest to the time of such liquidation; and also a sum in gross on account of his claims for personal injuries.

Justice had been denied him for years, but it was now promptly accorded in the award, and the finding of the court below shows that the King at the same time approved a certificate of the award, in accordance with the laws and customs of the country, and delivered the same to the claimant as conclusive evidence of the verity of the award. By the fourth finding of the court below it also appears that the United States was notified of that result, both by the government of Spain and by the claimant, and that the Secretary of State expressed his approval of it to both parties. Five days before the treaty was, the second time, submitted to the Senate for their advice, the claimant addressed a memorial to the President, making known for the first time what his pretensions were in the new aspect of his claim.

V. Briefly stated, they were to the effect that the Senate, if the treaty should be submitted for ratification, should either annex a new article recognizing his claim as expressed in the award made after the treaty was signed, or, if that could not be conceded, that the fifth renunciation should be explicitly excepted from the ratification and expunged from the treaty. Unless he could have a distinct recognition of his claim, he asked, as an act of justice, that the alternative request might be granted, that he might "be left free to prosecute the claim where it is unquestionably due, unembarrassed with the imposing renunciation of my country." Stronger language to express his convictions that his claim, as it existed when the treaty was signed, was included in the fifth renunciation of the same, could not well be chosen than he

employed in that memorial, where he says that it is his "decided election to abide the issue of an appeal to the moral sense and good faith of that nation rather than the chances of that contingent and long-deferred indemnity provided for the other claims into whose company mine has been introduced by the treaty."

Addressed, as the memorial was, to the President, he referred it to the Secretary of State for his opinion, and nothing can be more conclusive as to the views of the Executive than the report of the head of the State Department. By the statement of the memorial itself, said Mr. Adams, it was questionable to the Cortes and to the Minister of Finance whether or not the claim was included in the renunciation of the ninth article. If it was, said the secretary, the claimant will be entitled to the immunities stipulated by the treaty and *in the form provided by the same instrument;* if it was not, his resort is, as it originally was, exclusively to the Spanish government, and the Cortes, in recognizing his claim, have given directions for his payment. Both the memorial and the report of the Secretary of State were communicated to the Senate the next day after the treaty was transmitted for the consideration of that body.

Authority to appoint commissioners was conferred upon the President, as stipulated in the eleventh article of the treaty, by the fourth section of the act of the third of March, 1821, and it is well known that they were duly appointed and commissioned as therein required.*

They were duly organized, as required, and exercised the functions of their office for the period of three years. During that time the claimant, as the finding of the subordinate court shows, presented his claim to the commissioners as expressed in the award made by the Spanish commission, and it appears that the commissioners of the United States refused to allow the claim in that form. He was fully heard, but they ruled and decided that the only claims which they had authority to investigate and allow were claims existing prior

---

* 3 Stat. at Large, 639.

to the date of the treaty, and that inasmuch as the award presented was subsequent to the date of the treaty, they had no authority to investigate or allow it; and it appears that they accordingly rejected and dismissed the petition upon the ground that the evidence produced was not sufficient to establish the claim.

Plain as the decree of the commissioners is, it is not possible to misunderstand their views.   They held that all unliquidated claims of our citizens upon that government, statements of which, soliciting the interposition of our government, had been presented to the Department of State, or to the minister of the United States in Spain, since the former convention and prior to the signature of the treaty, were within their jurisdiction, but that liquidated claims or claims of a subsequent date were not within their jurisdiction.   Such also were the views of the Secretary of State in his very able despatch of the twenty-ninth of April, 1823, addressed to the chargé d'affaires from Spain.*

He shows to a demonstration that the time of the signature, and not that of the ratification of either of the parties, nor that of the exchange of ratifications, is expressly agreed upon as the time, until which the claims and the statements of them to the Department of State, or to the minister of the United States in Spain, had been received, which claims were, on the part of the United States, renounced by the fifth renunciation.

His reasoning is, that it could not have been the intention of the parties that they should renounce claims, or admit statements of them, not known to the party assuming the obligation at the time of contracting it; and the court here entirely concurs in that construction of the article.   Whatever claims, therefore, might arise, or whatever statements of them might be made after the signature of the treaty, were not within that provision, because they could not, with propriety, be provided for in any such stipulation.

Beyond all doubt it was unliquidated claims for which pro-

---

* Senate Document, Second Session, 18th Congress, 248.

vision was made, and neither party contracted that the other should determine their amount or validity, but the stipulation on the part of the United States was, that three commissioners should be appointed by the President, by and with the advice and consent of the Senate, and that the commissioners should determine the amount and validity of all such claims of our citizens.

Examined in the light of these suggestions we concur in the views of Mr. Adams, as expressed in that despatch, that " if anything in human intention can be made clear by human language, it is, that the claims provided for by the above stipulation were in the condition, as they had been exhibited, at the time of the treaty."*

VI. Transactions between the claimant and the government of Spain, subsequent to the signature of the treaty, could not be evidence to the commissioners of the condition of the claim at the time of that signature, and for that reason the court is of the opinion that the decision of the commissioners rejecting the claim, as expressed in that award, was correct. They did not reject the unliquidated claims of the appellant, as filed in the State Department, nor as presented to our minister in Madrid before the treaty was signed.†

Unambiguous as the decision of the commissioners is, there is no reason to suppose that the claimant was misled even for a moment. He knew that he had a right to present his claims to the commissioners as they existed at the time the treaty was signed, but he elected to stand upon the claim as it was expressed in the award, and he must abide the result, as in the opinion of this court the decision of the commissioners that the award was not within the stipulations of the treaty is correct.

Suppose all the preceding suggestions are correct, still the claimant insists that the judgment must be reversed on account of what appears in the fifth finding of the court. Unexplained the court below there find as follows: (1.) That the Cortes refused to annul the three grants in question until

---

* 1 Senate Documents, Second Session, 18th Congress, 250.

† 1 Rep. Com., First Session, 20th Congress, No. 58.

the United States should agree to pay and discharge in full the indebtedness of Spain to the deceased claimant, as recognized in the award of the Spanish commission. (2.) That the United States, by their minister at the court of Madrid, gave to Spain "a clear and distinct assurance that the debt due to the claimant would certainly be paid to him by the United States if the treaty was ratified, and the said grants were totally annulled." (3.) That the Spanish government, upon the faith of those assurances, annulled the grants and ratified the treaty. (4.) That the claimant duly notified the government of the United States of these facts, and of the assurances so given by our minister, and that the notice was duly received by the President, and was by him communicated to the Senate, at the same time that the advice of that body was asked, the second time, as to the ratification of the treaty. (5.) That the United States, with full notice and knowledge of all the facts and circumstances set forth in that finding, did accept and assent to the treaty as ratified by Spain, and became seized and possessed of the ceded territories.

Without stopping to show that the findings are contradicted by the testimony of our minister, or that they are improbable in themselves, or that they are unsupported by any satisfactory evidence, we proceed at once to remark that the claimant is entitled to the full benefit of the rule that the facts found in the court below are to be regarded as in the nature of a special verdict. Grant all that, still the findings are subject to many criticisms.

By what means did the court become judicially informed that the Cortes refused to annul the grants in question until the United States should agree to pay and discharge in full the award held by the claimant? Oral proof to that effect could hardly be obtained which would be of a satisfactory character, and if proof of that kind was not introduced, then the inquiry arises: Upon what evidence does the finding rest?

Legislative bodies usually act by decree, resolution, order, or vote, but nothing of the kind is referred to as existing in this case. Depositions of two witnesses were introduced to show that our minister gave the assurances specified in the

finding, but he states in his deposition that he does not remember that he ever gave any such assurances, and there is no reason to conclude that he ever intended to enter into any contract upon that subject. Who knows that the government of Spain in deciding to annul those grants acted upon the faith of the assurances given by our minister that the claims of the ancestor of the appellant would be paid in full, as expressed in the award made long after the treaty was signed; and if no one is able to give testimony to that effect, by what means was the conclusion formed? Tested by these or any similar considerations it is easy to see that the several conclusions embraced in the fifth finding are conclusions of law rather than conclusions of fact, as they depend mainly, if not entirely, upon the construction of public acts, diplomatic despatches, and treaty stipulations.

Regarded in that light the finding of the court below may be re-examined here on appeal, but it is not necessary to rest the decision in this case upon that ground, as by the very terms of the finding it appears that the assurances which it is supposed misled the Cortes were given by our minister, and there is no evidence whatever that in giving the assurances he acted in pursuance of any instructions from the President or by virtue of any authority from the United States. Negotiations are usually conducted under instructions from the President, and the provision of the Constitution is that " he (the President) shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur."

Such an assurance as that supposed could not be given by any minister of the United States, except upon the condition that it should become a treaty stipulation, and as such be subject to the approval of the President and be ratified by the Senate, as required by the Constitution.

Even if the finding had any foundation in fact, it is clear that the act of our minister in giving the assurances was wholly without authority, and that the act was null and void, which must have been known to the Spanish government and to the claimant.

VII. Examination will next be made of certain other complaints made by the appellant, as exhibited in the eighth finding of the court below. The substance of that finding is as follows: (1.) That the claimant, on the seventh of April, 1823, and before the commissioners under the treaty rejected his claim as founded upon the award, requested the United States to procure from the Spanish government his original vouchers and evidences of indebtedness; that the United States made the demand as requested, but that the Spanish government positively refused to comply with the request, upon the ground that the award was a judicial decree and was final and conclusive. (2.) That the Spanish government did subsequently assure the United States that the vouchers and documents would be given up, but that the same never were produced, and have ever since been, and still are, withheld. (3.) That by reason of such refusal and neglect on the part of Spain, the commissioners never considered or allowed his claim; that they allowed the claims of other persons, existing prior to the treaty, to an amount greater in the aggregate than the five million dollars provided by the treaty, and that the commission, after making those awards, expired.

Regarded in the most favorable light, the facts stated in the finding do not show any ground of action against the United States: (1.) Because it appears that the claimant never presented to the commissioners his unliquidated claims as they were filed in the State Department, or as they existed at the time the treaty was signed. (2.) Because the finding does not show that he ever intended to present his claims in that form to the commissioners, nor that he was prevented from so doing by the neglect and refusal of that government to produce his original vouchers and documents. (3.) That even if the finding did show that he intended to present his claims in that form, and that he was injured by the alleged neglect and refusal, still the admission would not benefit the appellant, as the finding, with that admission superadded, would not show any cause of action against the United States within the acts of Congress conferring jurisdiction upon the

Court of Claims, as it would not show a claim founded upon any law of Congress or upon any regulation of an executive department, nor any claim founded upon any contract, express or implied, with the government of the United States.

VIII. Some consideration must also be given to certain general propositions submitted by the appellant as tending to bring his case within the scope of an implied contract.

1. He contends that the United States had no power to release Spain from her obligations due to the ancestor of the appellant, without his assent, except upon the condition of making him just compensation for his claims.

Special examination of that topic or of its conditions and qualifications is not necessary, as the case before the court comes within the rule, as conceded by the appellant, as his ancestor did submit his claims to the Department of State for that protection which his government might think proper to grant; and the finding of the court below is that the claimant, both before and after the date of the treaty, did invoke the aid of the United States in collecting his claims, both those arising on contracts and those arising from personal injuries.*

2. Attempt is also made to maintain the proposition that the power which the claimant gave to the United States to make reclamations in his behalf became revokable by him after the six months fixed by the treaty for the exchange of the ratifications had expired, but the proposition is wholly inadmissible, as the effect would be that whenever any such misunderstanding should arise between the contracting parties, the negotiations might be controlled by a single claimant having some pecuniary interest in the treaty.

3. Next suggestion is that the act of the claimant in submitting his claims to the Spanish commission operated as a full and complete revocation of the power he previously granted to the United States to adjust his claims, but the proposition is even less defensible than the preceding one,

---

* 2 Rep. Com., 1st Session, 22d Congress, No. 316; 3 Senate Documents, 1st Session, 19th Congress, p. 66; De Bode v. The Queen, 3 House of Lords Cases, 449.

as it would enable one of the contracting parties, by making terms with a citizen of the other party, to avoid the obligation of fulfilling a treaty stipulation.

4. Remark upon the sixth finding of the court does not seem to be necessary, as what has been said in response to the fifth finding furnishes a full answer to every deduction made from it by the claimant. This award was made long after the treaty was signed, and the claim in that form never was included in the fifth renunciation. In his memorial he requested that a new article might be added to the treaty, making provision for the payment of his claim as expressed in the award, or that the fifth renunciation might be expunged, but the request was not granted, nor could it have been in the alternative form without defeating, in all probability, the whole arrangement.

Entitled as the claimant clearly was to prove his unliquidated claims before the commissioners, it is much to be regretted that he did not seasonably come to the conclusion to adopt that course and avail himself of the plain right secured to him by the treaty. His error in that behalf increased the equation to other claimants, and now his only remedy is by an appeal to the equity of Congress.

Under the circumstances one or two observations upon the conclusions of law certified by the court below will be sufficient. We do not concur in the first nor the second finding, except that part of it where the court say that the decision of the commissioners appointed by the United States dismissing the claim was final and conclusive, and bars a recovery upon the merits in that court. We concur also in the third conclusion of law, and direct that the judgment be

AFFIRMED.

Mr. Justice BRADLEY had not taken his seat upon the Bench when this judgment was given; and the case was argued February 28th and March 1st, 1870, before Mr. Justice STRONG had taken his seat.