Richardson J.,
delivered tbe opinion of tbe court:
Tbe claims upon which this action is founded were referred to tbe court by an order of tbe Senate of tbe Dnited States, and arose out of tbe public operations of Lieut. Col. John C. Fré-mont in California in tbe years 1846 and 1847, and events connected with tbe difficulties and war between this country and tbe Republic of Mexico, which resulted, among other things, in tbe conquest and annexation to tbe Dnited States of that part of Mexican territory which was then called Dpper California.
These events and tbe operations of tbe military and naval forces, and tbe transactions of tbe public officers of tbe Dnited States serving in that territory immediately before and after its final conquest, excited great and general-public interest throughout the country at tbe time of their occurrence, and complete and trustworthy narratives, reports, and records thereof have *126 long' since been spread before the public through, the proceedings of a general court-martial, held at Washington in 1847 and 1848, for the trial of Colonel Frémont, which were communicated to Congress 1>3’ the President, and printed in an executive document, as well as through other Congressional documents and the historical writings of trustworthy authors. (First session of Thirtieth Congress, 1S48, Executive Documents of Senate Nos. 33 and 70; Report of Committee, Senate, No. 75; Eeport of Committee, House, No. 817; Ripley’s War with Mexico,'vol. 1, 1849; The Mexican War, by Mansfield, 1848; Histoiy of the War between the Hnited States and Mexico, by Jenkins, 1849; Tuthill’s Histoiy of California, 1846; Bigelow’s Life of Colonel Frémont, 1856; Hpham’s Life of J. C. Frémont, 1856; Memoirs of Cen. W. T. Sherman, vol. 1, 1875.)
The claimant has not proved and does not rely upon any special authority conferred upon Colonel Frémont to contract the obligations on the part of the Hnited States set forth in the petition, but rests upon implied authority which he assumes that officer possessed from his official relations to the Government and the circumstances in which he was placed, as shown or known only through sources of information-of a historical and official character, open alike to the public as to this court.
The court will take judicial notice of the leading and controlling events in the histoiy of the country and of the official relations of the principal actors therein to the Government; and, in elucidation thereof, also of less important transactions of general and public interest immediately connected therewith, when tiny have passed into commonly-received authentic histoiy.
The operations of the military and naval officers of the United States in the conquest of California and immediately subsequent thereto, and the action of the executive and legislative branches of the Government thereon so far as they were of a public nature and indicate the true relation of Colonel Frémont, who performed a leading and conspicuous part therein, to the national Government, and his authority or lack of authority to bind the United States by contracts entered into by him in the official capacity which he claimed as a governor of California,” must be regarded now, after the lapse of more than thirty years, as such historical facts of public and general notoriety as may be hero judicially taken notice of by the court, especially as neither *127 party relies upon any other facts by which his authority can be determined.
In Meade v. The United States (9 Wall., 691), on appeal from this court, the judges of the Supreme Court took judicial notice of historical and national political facts bearing upon the merits of that case of much less general and public interest, notoriety,, and comment than the material facts to which we shall have occasion to refer in this opinion, and acted upon their own views thereof, independently of the specific findings which were hero made and sent up to them.
A concise narrative of the public movements of Colonel Fré-mont in relation to the conquest of Upper California will afford, and are necessary to, a clear understanding of the circumstances under which he claimed authority as “governor” thereof, and a summary of the action of Congress and the Executive will show how far his operations and assumed authority were adopted and ratified by the Government.
In the year 1845 John C. Frémont, then a brevet captain of Topographical Engineers in the United States Army, but afterward, in 1846, appointed lieutenant-colonel of the then new regiment of mounted riflemen, who had already distinguished himself by his intrepidity and ability in two expeditions of exploration across the continent, was sent out by the Government at Washington at the head of a third expedition of like character, and especially instructed to find, if possible, a new and better route from the base of the western side of the Bocky Mountains to the mouth of the Columbia Biver.
Arriving in California, then Mexican territory, some time in the winter of 1845-’46, and charged in his instructions not to provoke hostilities with the Mexicans, he at once sought an interview with the governor, Castro, and easily obtained from him oral permission to go where he pleased, the governor kindly saying that the whole country was' open to him. This permission Frémont could not obtain in writing,, as he desired, and it was soon revoked by the governor, who ordered the young explorer with his party forthwith to leave the country, and followed up the order by the hostile array of a small force of infantry, cavalry, and artillery, threatening the camp of the exploring party, but making no actual attack.
Frémont, anxious to continue peaceably the important and interesting work for which he had been sent out, and then *128 earnestly devoted to the line of that duty, seeing no prospects of being permitted to remain in Mexican territory unmolested, broke up his camp and proceeded toward Oregon.
Since he had left Washington the difficulties between the United States and Mexico had increased and war was imminent. Captain Gillespie, of the Marine Corps, had been dispatched to overtake him, with a letter of introduction from Mr. Buchanan, Secretary of State, some oral messages, and a letter from Mr. Benton, Senator from Missouri. Captain Gillespie, who had crossed through Mexican territory in the guise of an English merchant, reached the exploring party and communicated the messages and delivered the letters about the 9th of May, 1846. The exact terms of the letter from Senator Benton and the oral messages have never been given to the public, but they made such an impression upon Colonel Frémont as to induce him immediately to abandon his expedition of exploration and retrace his steps and return to California. Arriving there, he found some of the residents in a state of insurrection against the existing government, and joining the insurgents, he raised and organized a battalion of soldiers for active warfare, taking command himself without appointment from any superior organization, and acting wholly upon his own authority and on his own responsibility.
Early in July, 1846, the revolutionists at Sonoma issued a declaration of independence, declaring the country free from the dominion of Mexico, and established a nominal government, under a flag bearing the emblem of a grizzly bear, which gave to them the name of “bear party,” and to the insurrection the name of “the bear war.”
Before that date,'on the 13th of May, 1846, Congress had passed an act and the President had issued a proclamation declaring that “ by the act of the Republic of Mexico a state of war exists between that government and the United states ” (9 Stat. L., 999), but the knowledge of that fact did not reach, and could not have reached, Colonel Frémont, by the then existing means of conveyance, until long afterward, and he continued to carry on his military operations on his individual responsibility.
On the 7th of July, 1846, Commodore Sloat, of the Navy, in command of the Pacific squadron, reached Monterey, and finding Fré-mont exercising military command and a revolution apparently successful, took possession of that place and raised the United *129 States flag; whereupon Frémont hauled down the flag of the grizzly bear and raised that of Ms own government. And tMs was the first act of Ms, after Ms return to California from Oregon, in which he assumed to act in the interest and for the benefit of the United States.
Commodore Sloat supposed that Colonel Frémont was acting under orders from the Government at Washington, and finding that such was not the fact, he became alarmed at the authority and responsibility which he himself had assumed, and refused to proceed further with Frémont in his movements for the subjugation of the country.
On the 15th of July, 1846, Commodore Stockton arrived, and soon afterward Commodore Sloat turned over to him the command of the Pacific squadron and returned home.
Commodore Stockton forthwith entered into arrangements with Colonel Frémont to carry on active operations for conquest, and on the 23d of July, 1846, appointed the latter “ to the command of the .California battalion of United States troops, with the rank of major,” and thus, so far as he had authority, adopted Colonel Frémont’s battalion of volunteers into government service. By the j oint operations of the military and naval forces thus under the command and direction of Commodore Stockton, Upper California was substantially and practically conquered for the United States before January 1, 1847.
Brigadier-General Kearny had been sent out, under instructions from the Secretary of War, dated June 3 and 18, 1846, in command of an expedition “to take the earliest possession of Upper California,” and the instructions set forth tMs direction : “ Should you conquer and take possession of New Mexico and Upper California, or considerable places in either, you will establish temporary civil government therein, abolishing all arbitrary restrictions that may exist, so far as it may be done with safety.”
He arrived in California, not without obstruction and some severe encounters with the enemy, about the 1st of January, 1847, and claimed to be the head of the civil as well as military power of the United States in the territory. This claim was opposed by Commodore Stockton, on the ground that he himself was .the conqueror of the country, and as such, by the rules of war, was entitled to establish a civil government, and that the instructions given to General Kearny more than six *130 months previously, to establish such government, were conditioned upon his, Kearny’s, conquering the territory, and did not apply to the actual condition of affairs which existed on his arrival.
On the 16th of January, 1847, the very day on which General Kearny gave to Colonel Frémont his first written order, in which he directed that no change be made in the organization of his battalion of volunteers, or officers appointed in it, without the sanction or approval of General Kearny being first obtained, Lieutenant-Colonel Frémont was formally appointed and commissioned by Commodore Stockton as “governor and commander-in-chief of the territory of California.”
In this controversy between Commodore Stockton and General Kearny, Fremont joined the side of the former, and so notified General Kearny in writing the day following the receipt of his commission as governor, saaing that until those officers adjusted between themselves the question of rank, he should have to report to and receive orders from the commodore. And he set up, or attempted to set up and maintain, a civil government, with himself at the head, “ enlisted or retained soldiers in his employment, refused to muster them into the service of the United States or to discharge them, or to obey the orders and commands of General Kearny.”
Commodore Stockton was succeeded in command of the Pacific squadron by Commodore Shubrick, who removed all further cause for any possible claim of right on the part of Frémont to act under the authority of the naval commander, by notifying him, in February, 1847, that he recognized General Kearny as commander-in-chief of the land forces in California. And yet Frémont still continued to defy the superior authority of that officer, and to assume civil power under the title of governor for some time after the claims now in suit were contracted by him in that capacity, and until he was obliged to yield by instructions from Washington which could no longer be misunderstood or misconstrued, and a few months later he was sent home under arrest for these acts of insubordination.
As to the relative or superior authority among military officers in the field of active operations, when a controversy arises and each assumes responsibilities and obligations inconsistent with the authority claimed by others, courts are conclusively bound by the determination of the executive and legislative branches *131 of tbe Government thereon, as they are by tbe determination of those branches as to bow far tbe conduct of military officers acting on their own responsibility and without lawful authority previously conferred is ratified, confirmed, and adopted by the Government.
In relation to the military operations of Colonel Frémont in the conquest of Upper California and the controversy between him and General Kearny thereafter, tlie action of the Executive and of Congress was clear and decided at the time of the occurrence and afterward, and leaves nothing in doubt or uncertainty respecting their true official relations to the Government of the United States.
The conduct of Colonel Frémont in raising a battalion and carrying on war against the Mexican authorities on his own responsibility at the beginning of the insurrection, and his operations generally up to January 1, 1847, have been adopted and approved. No complaint was made of his course in abandoning the exploring expedition upon which he had been sent out,nor of his engaging in private warfare while holding a military commission in the United States Army, and he was recognized as- continuously in the employment of the Government during the whole of his operations and until he voluntarily resigned. The conspicuous part which he took in the conquest, and the value and usefulness of his sendees, were acknowledged by the Secretary of War, Mr. Marcy, and declarations of approval and commendations for his gallantry were made under executive authority. Congress passed an Act August 31, 1852 (ch. 110, § 6, 10 Stat. L., 108), making an appropriation for the pay and equipment of, and the settlement of claims for supplies, for, the volunteers serving under him chiving the year 1846, and providing for the appointment of a board of officers to examine- and report to Congress upon all such claims as might be presented for funds advanced and subsistence and supplies of all kinds furnished or taken for the use of said command “ while thus engaged in the public service.” But this act neither ratified nor referred to any service later than the year 1840.
On the other hand, the Executive fully recognized the authority claimed by General Kearny after his arrival in California in January, 1847, to be at the head of the civil government and to, be commander-in-chief of all the land forces of the United States; within the Territory, and never acknowledged Colonel Fremont *132 as governor, nor as having- any right to enlist, equip, and maintain officers and men under his command and in his employment independently of General Kearny as his superior officer. The superior authority of General Kearny was officially acknowledged in a letter from General Scott to that officer, dated November 3,1846 ; in a communication by the Secretary of the Navy to Commodore Stockton, November 5, 1846; in a letter from the Secretary of War to General Kearny, June 11,1847, and in a communication from him to the President, January 19, 1848, all officially communicated to Congress and printed among the public documents. And, what is perhaps more decisive, Colonel Frémont was tried by a general court-martial, held at Washington in 1847 and 1848, on three charges and twenty-three specifications, among which it was charged that he proclaimed himself to be and assumed to act as governor of California in contempt of the lawful authority of his superior officer, Brigadier-General Kearny; that he refused to march such part of his battalion to Yerba Buena as refused to be mustered into the service of the United States, there to be discharged, and other acts of insubordination, and he was found guilty on all the charges and specifications, and ordered to be dismissed the service. The finding of the court-martial was approved by the President, except that he was not satisfied that the acts constituted the military crime of mutiny, and the sentence was remitted. This was an authoritative declarationby thePresident of the United States, the Commander-in-Chief of the Army and Navy, that Colonel Frémont unlawfully assumed to be and to act as governor of California^ and that some of his military operations after January 16,1847, were conducted in insubordination. And Congress has never passed any act for the general settlement and payment of the contracts entered into by him during that time.
It is true that Colonel Frémont was sued in England in 1852 upon four bills of exchange, drawn by him as governor of California March 18, 1847, upon James Buchanan, Secretary of State, and protested for non-payment; that judgment was recovered thereon against him in the court of exchequer (Gibbs v. Frémont, 9 Exch., 25); and that Congress, by act of March 3, 1853, chapter 101, made an appropriation for the payment of that judgment (10 Stat. L., 759); but that act ratifies and adopts no other contracts than those specified therein, and it refers to Frémont as “late a lieutenant-colonel” and not as “governor of *133 California,” and provides that “before payment tbe Secretary of tbe Treasury shall be satisfied that tbe amount has been expended for tbe benefit of tbe pubbc service.”
Congress might in like manner provide for tbe payment of tbe obligations incurred by Colonel Frémont which are tbe foundation of this action, but as it bas never done so, nor in any form recognized them as valid and binding upon tbe Government, tbe claimant bas no remedy in this court.
Tbe only claim earnestly pressed xipon us in tbe argument is on a promissory note, of which tbe following is a copy:
“Eight months after date, I, J. 0. Frémont, governor of California, and thereby the legal agent of tbe Government of tbe United States of North America, in consideration of tbe sum of two thousand five hundred dollars being loaned or advanced to me for tbe benefit of said Government of tbe United States by Eulogio de Celis, hereby promise and oblige myself, in my fiduciary character as governor aforesaid, and my successors in office, to pay to said Eulogio de Cebs, bis bens, executors, administrators, and assigns, tbe aforesaid sum of two thousand five hundred dollars, without defalcation. It is agreed and understood that if tbe aforesaid sum of two thousand five hundred dollars is not paid on or before maturity, that it is to draw interest at tbe rate of two per cent, per month from tbe time it falls due.
“In testimony whereof I have hereunto set my band and caused tbe seal of tbe Territory to be affixed, at tbe city de los Angeles, tbe capital of California, this third day of March, in tbe year eighteen-hundred and forty-seven.
“J. C. FRÉMONT,
“ Governor of California.”
Tbe exact pxxrpose for which Colonel Fremont used tbe money obtained upon this note is not found by tbe coxxrt and was not proved, because be rendered no accoxxnt and returned no vouchers. As be was carrying on a civil government tbe authority for which was expressly disavowed by tbe Executive, and to some extent maintained a command in defiance of tbe authority of bis sxxperior officer, enlisting men and refusing to muster them into tbe United States service,'for all of which be could draw no money or supplies in tbe ordinary and legal methods provided in tbe service, we may presume that tbe money bor *134 rowed by Mm was used for purposes not recognized as legitimate by tbe government, or at least in tbe absence of proof we are not at liberty to presume otherwise. And so tbe claimant ■does not stand in tbe position of having advanced money which tbe United States have bad tbe benefit of, if that were bis claim independently of tbe express contract proved by tbe promissory note sued upon. Even if Colonel Frémont were then tbe lawful military governor of California, it would not necessarily follow that tbe United States would be liable for money borrowed by him in bis official capacity, without- express proof, at least, that it was used in tbe recognized public service. (The Floyd Acceptance Cases, 7 Wall., 666.)
Another claim set up in tbe petition is for tbe price of 600 bead of cat-tie sold to Colonel Frémont under a contract of March 3, 1847. These cattle were delivered April 26, 1847, when Fré-mont gave to tbe claimant’s intestate a certificate of acknowledgment, certifying that there was due to him from tbe United States tbe sum of $16,975, subject to interest at 2 per cent, per month after thé expiration of eight months from April 18,1847, until paid. Tbe claimant now seeks payment of that obligation and $5,000 damages, and interest on tbe whole.
Tbe facts in relation to these cattle are, that when they were delivered to Frémont be bad no use for them, and be turned them over to one Stearns to be pastured for three years at tbe compensation of one-half their natural increase. Stearns drove them into Lower California, in Mexican territory, and there pastured them on bis own land for tbe time agreed upon. At tbe expiration of that time, Frémont, being no longer in tbe public service, having resigned bis military commission, and not being able himself to pay for tbe same, and tbe United States Government not having adopted or ratified bis contract, redelivered all tbe cattle and half tbe increase to tbe original owner, as agreed upon, and they were accepted by him on tbe land of said Stearns in Mexico. This claim, besides being open to all tbe objections found against tbe promissory note sued on, is even less meritorious on tbe part of tbe claimant, because tbe property was returned to him, and it does not appear that be suffered any loss.
Still another clabn is set forth for $712.58, paid for duties assessed and collected by tbe collector of the port of. San Diego *135 on tbe cattle wlieu brought from Mexican territory, after baying been pastured there three years, into the United States.
Against the consideration of this claim by the court the Assistant Attorney-General sets up the plea of want of jurisdiction, on the authority of Nichols v. The United States (7 Wall., 122). It was held in that case, as we have repeatedly held, that to claims for the recovery back of taxes and duties illegally assessed, for which special provisions are made by statute, giving jurisdiction to other tribunals and other courts, the general jurisdiction of this court does not attach., (Kaufman v. The United States, 11 C. Cls. R., 659; Boughton v. The United States, 12 id., 330; Winnisimmet Company v. The United States, 12 id., 319; Walker v. The United States, 12 id., 408.) And the position of the Assistant Attorney-General would be correct if the claimant were here of his motion, voluntarily invoking the jurisdiction of the court. But this claim was specially referred to us by an order of the Senate of the United States, under that provision of the statute which expressly confers jurisdiction upon this court over “ all claims which may be referred to it by either house of Congress.” (Act February 24, 1855, ch. 122, § 1, 10 Stat., 612, now .Rev. Stat., § 1059.)
Upon the question whether or not we have jurisdiction of such a claim thus referred to us, it is unnecessary now to express a final opinion, because there are two substantial grounds of defense on the merits which have been fully argued, while the jurisdictional question was not considered by the claimant’s counsel at the trial. First, the duties must be held to have been voluntarily paid, no protest or objection having been proved (Rev. Stat., § § 3010-3014, and the acts revised therein); and, second, it does not appear that they were not legally and properly assessed and collected. The claimant’s intestate owned the cattle in Mexican territory and regularly imported them into the United States, and thereby became hable to pay duties thereon, even although they had previously been in this country. ■(Customs Regulations, Treasury Department, 1874, art. 373,378, and like regulations and laws previously existing.)
On the whole case, the claimant has no legal cause of action, •and his petition must be dismissed.