Davis, J.,
with whom concurred Richardson, J.,
dissenting.
The minority of the court is of opinion that the ju Igments which have just been announced are not warranted in fact. It also seems to us that they rest upon principles at variance with sound doctrines of international law, and in conflict with the interests of this nation in its international relations. We are further of opinion that they are not authorized by the act of June 19, 1878, which grants the only power we have to hear •and decide these cases. In presenting the reasons for our conclusions, we will consider, as briefly as the imi>ortance of the subjects will allow: I. The origin and nature of the Chinese indemnity fund. II. Its administration by the United States. III. The facts upon which the claimants ground their claims upon it. IY. Their legal rights and obligations in that respect. Y. Their participation in the former distribution of it. YI. Their rights under the act of June 19 1878.
• I. The origin and nature of the fund.&emdash;We must disembarrass ourselves at the outset of the fallacy that China ever admitted liability for any specific claim against the fund, or made any Total No. *599 payment with a purpose that it should be applied specially on account of such a claim. In discussing this branch of the case, we shall, under the authority of Meade’s Case, 9 Wall., 691, and De Celis’s Case, 13 C. Cls. R., 117, refer to some well-known general historical facts connected with the treaty which are not in the findings of fact.
The 19th article of the treaty of 1844 provided that the Imperial Government should protect American residents in the five ports (8 Stat. L., 596). By the 26th article it was stipulated that if the merchant vessels of the United States should be plundered by pirates, or robbers while within waters over which the Chinese Government exercised jurisdiction, the local authorities would cause the property to be recovered; but that if, by reason of the extent of territory and numerous population ■of China, the property could only in part be recovered, then the Chinese Government would not make indemnity for the goods. (Ib., 598.)
The Taeping rebellion broke out in 1850; and when the Caldera was seized the rebels were in undisturbed possession of the rich province of Kiang Su and Nanking, its capital, between Peking and the five ports. A series of injuries to persons and properties of Americans in China happened between 1844 and 1858, in consequence of the social anarchy and executive paralysis which were caused by the rebellion. Some of these acts were subject to the provisions of the treaty respecting violence on land; others, like those done to the Caldera and her cargo, to the provisions relating to piratical acts done in Chinese waters. From time to time, as injuries occurred, reclamations were made upon the local authorities. China invariably denied any and all liability.
In 1858 a treaty was concluded which authorized an American diplomatic representative to reside at Peking. (12 Stat. L., 1023.) In entering the western family of nations China relieved herself of past causes of difference by concluding the claims convention, whose fruits form the subject of this controversy. (Ib., 1081.) Without referring to any particular claim, the American plenipotentiary demanded a gross sum in satisfaction of all claims. Without admitting liability for any, the Chinese negotiator offered a less sum to be rid of all. They agreed upon a compromise amount, which was paid and received as a satisfaction.
*600 By accepting this money the United States agreed to satisfy from it all claims for which China was liable; but they were bound to pay out of it only what China was bound to pay into it. In the preliminary negotiations and in the treaty, there was no mutual recognition of any specific liability in China for particular claims or for settled amounts. It therefore became the duty of the United States, in their new relation to the claimants, to scrutinize each claim. This duty was the same whether the United States were regarded as trustees for China, paying out the fund as China should have paid it; or, as a trustee for their own citizens, distributing it according to the principles of its municipal law; or, as a sovereign, dealing with subjects according to the dictates of conscience.
The previous act of their Executive in demanding reclamation, no matter how strongly expressed, did not excuse them from making these inquiries. An international reclamation is only an invitation from the one government to the other to inquire into the merits of the demand. If the government which makes the demand then rests (as the United States rested after the refusal by China), it is not committed to the justice of the claim, or to the obligation to enforce it. If the receipt of a sum in gross from the other government in satisfaction of all demands imposes the obligation of distributing it among those entitled to it, bona fide claimants have a right to have the com- .• mon fund protected against spurious claims. This involves a judicial inquiry into the merits of each claim presented for participation in the distribution, and into the just amounts of those which have merit. But if it can be maintained that the act of the Executive in presenting a claim to a foreign government is in effect a determination that the claim is just, the distributing court is deprived of jurisdiction over the main question as to the merits. The majority of the court appear to give this force to an Executive act. We are constrained to disagree with them. During the present century thirteen courts have sat, under statutes of the United States, for the purpose of distributing-funds received under treaties, in satisfaction of international demands. So far as we are advised, it has never been held that a previous Executive demand precludes the court from inquiry into the legal merits of a claim; but the uninterrupted practice has been to the contrary. Certainly the commission which sat in China exercised that power, and in the case of these very *601 claims assumed iu their discussions that they were empowered to sit in judgment on their merits in law..
The instructions of Mr. Cass and Mr. Marcy were plainly regarded at that time as (as in fact they were) domestic acts done by a superior to a subordinate. They, were in no sense international^ and they were then and still are no bar to a judicial investigation of the subjects to which they relate. An Executive instruction is conclusive in matters intrusted exclusively to executive discretion (6 Op. Attys. Gen., 626); but on subjects which are referred for judicial determination, it is entitled only to the weight which the character, learning, intelligence, and discretion of the particular officer give to it. No imputation is cast upon the Executive if the judiciary fails to agree with it.
After the commissioners had done their work, as we shall see in the next branch of the inquiry, there was a large surplus left from the fund. In a message to Congress, President Buchanan said that this “belonged in equity to the Chinese Government.” President Lincoln said substantially the same thing. In President Johnson’s time the money was received in Washington and invested in a separate fund in the Department of State, where it still is. It has never been in the Treasury. President Grant more than once reported its condition to Congress. Bills were introduced there for the purpose of covering it into the Treasury, but Congress invariably neglected or declined to do so. The latest evidence of the purposes of that body is in the act of June 19, 1878. It looks upon the fund as still applicable to the payment of proper claims, and still it makes no provision for covering into the Treasury as the property of the United States what may be left after these cases shall be determined. It does not regard the remainder as belonging to the United States; the only other possible owner is China. For these reasons we assume, as a starting point in our inquiry, that this fund equitably belongs to China, except so far as claimants are entitled to participate in it in consequence of injuries inflicted in China, for which the Imperial Government was internationally responsible to the United States when the convention of November 8, 1858, was concluded, and that we are bound to see that nothing is taken from it for which China was not internationally liable.
II. The administration of the fund by the United States. — The amount paid by China was $735,238.97. By the act of March *602 3, 1859 (11 Stat. L., 408), Congress authorized, the President to appoint a commission to aid the Secretary of State in distributing this money. The purpose of Congress in this act is plain. The commissioners were at first to act as auditors only. They were empowered to receive and examine claims. They were required to report the results of their auditing to the diplomatic representative of the United States in China. His approval was necessary before the audits against the fund could be operative. On receiving that, they were to become “awards” payable from the fund.
The commissioners selected for this responsible work were fitted for it by special training. Both were residents in China; one was in the consular service there. Both knew, directly or indirectly, most of the claimants, most of the witnesses, and most of the transactions to be investigated. Each was a man of integrity and personal character. The record furnishes abundant proof that each was a man of intelligence and capacity.
In making their awards and distributing the money, the commissioners, as we have already said, scrutinized all claims presented. Some they allowed in full; some they rejected in foto ; and some, among which were the Caldera claims, they allowed in part and rejected in part. After they had rendered their decisions and the awards had been paid, a further payment was made in China from the fund to the representative of Booney, the master of the Caldera. After payment of all these sums, and of all incidental' expenses, $220,000 remained. (Dip. Cor. 1865, pt. 2, p. 443.) This was transmitted to Washington. Since its arrival here, one payment has been made from it, under the provisions of the Act of February 22, 1869 (15 Stat. L., 440). On the 8th day of October last it amounted to $614,373.63.
III. The facts respecting the claimants’ demand upon the fund.— In October, 1854, the Chilian bark Caldera, commanded by Matthew Rooney, a naturalized citizen of the United States, lay at Hong-Kong taking in a cargo on American account for San Francisco. The vessel and some of the cargo was also insured on American account, and some was uninsured. She had also on board some property of the master, part of which was a small risk on his own account, and the remainder personal property, like clothing, silver table-service, &c., not stowed in the hold.
On the 5th day of that month, at 5 o’clock in the morning, *603 be bark set sail on her voyage. On the 7th day of the same month, at 4 o’clock in the afternoon, she dropped anchor in a )ay in the island of Koelan, off the coast of China, to the south if Macao. Daring that night she was seized by pirates. Her condition at the time of her seizure may be learned with reasonable accuracy from the master’s protest. A typhoon struck the vessel soon after leaving port. The master describes this, and then continues thus :
“Double reefed the topsails; gale increasing; furled all sail; vessel under bare poles; the wind blowing a perfect typhoon; heavy cross-seas running, and the vessel labored heavily. The typhoon increasing, and higher cross-seas running, the vessel strained much. The sails, which were snugly furled and well secured, were blown to ribbons by the fury of the gale. The mizzen-mast and fore and maintop-gallant masts, and the jib-boom were blown away. The vessel still laboring heavily, the rigging became slack, and the masts worked to and fro with great violence, endangering the hull of the vessel. The vessel leaking badly (though when she left port she did not leak a drop), the crew being disabled and injured, he resolved to seek for shelter, and he steered for the nearest land; and on the 7th day of October, at 4 o’clock p. m., sighted Fire Islands about two miles distant, in the vicinity of which was discovered a bay where there was a smooth sea. In going in for an anchorage, the vessel took the ground in three fathoms of water; he succeeded in getting her off into four fathoms, where he anchored. The vessel, being badly strained, leaked very much, and the pumps were consequently properly attended to. The night was dark and stormy, and the men were employed at the pumps to keep the vessel free, and that while at work they were surprised by the crew of three large junks, which boarded the ship suddenly.”’
These junks were part of a large fleet of pirates collected at that island in sufficient numbers to set the Chinese authorities at defiance. They robbed the vessel of its cargo, all of which, with a slight exception, disappeared, and they destroyed the vessel.
The master’s account shows conclusively that the vessel had suffered serious injury before it was seized by the pirates. If she had not been destroyed she could not have been repaired at Koelan. It would have been necessary to take her to Hong-Kong. The cost of towing vessel and cargo to Hong-Kong would have been $5,000. As the value of the cargo (exclusive ofRooney’s property) was $62,754.24, and the policy on the vessel was for $20,000. it follows that the ship’s proportion of the sal *604 vage would have been $1,208.04. After arrival at Hong-Kong it would have cost $13,500 to put the vessel in repair. By this process the loss on the policy on the vessel, caused by the acts of the pirates, is fixed at $5,291.96, so far as it is shown by any proof outside of the award.
The condition of the cargo at the time of the seizure is left more to conjecture, except as it is settled by the award. It is plain, even to a layman, that it was badly damaged. The experts said that in their opinion fully one-third of the teas were wet in the hold by water which had been thrown among it by the rolling of the vessel, and that another part, but how much they could not say, was damaged by water from above through the hatches and open seams. There were no conveniences at Koelan for drying and storing these wet .teas. Had they been saved, it would have been necessary to take them to Hong-Kong. Their proportion of this salvage would have been $3,791.96, or about 6 per cent, of their cost. This amount would have to be deducted from the market value of the damaged teas at Hong-Kong in order to ascertain their value at Koelan.
The majority of the court has found as a fact, in finding XXXII, that although it appears that damage was sustained by the vessel and cargo from perils of the sea, the amount of such damage has not been established by either party. This finding seeks to determine as a fact what is in reality a question of law. Other facts in the finding show that the commissioners did audit and determine, and with the approval of the minister did award, that the property suffered sea damage to the extent of 60 per cent, of its value, and that the parties expressed their satisfaction with the amount awarded, and that the several amounts awarded were received without protest or dissent, although there was ample time for it. Some of this evidence was a judgment — the highest class of proof; all of it was pertinent. The conclusion deduced from it by the majority, that the amount of the damage is not established, is in reality a conclusion of law as to the force of the former judgment. It is reviewable above, although it takes the form of a finding of fact. (Meade’s Case, 9 Wall., 722; Clark's Case, 96 U. S., 49.) In Calhoun’s Case (14 C. Cls. R., 193), it was held that when three members of the court concur in a finding of fact, it is conclusive; but the present minority did not then, and do not now, assent *605 to tbe doctrine that wben it appears by the findings that an ultimate fact in them is a conclusion of law, and that all the previous facts from which it is deduced are in the findings, the minority are concluded from dissenting to it. The right of dissent is co extensive with the right of review; and in such case the right of review exists. In our-opinion, the award is competent proof to show, and, in the absence of contradictory proof, fixes the amount of the sea-damage at Koelan at 60 per cent, of the cost of the property. It would have required about 6 percent. of that cost to remove the teas to Hong-Kong. The commissioners, therefore, found the damage to be about 54 per cent, of the cost at Hong-Kong. There is a great probability, derived from a general knowledge of the forces which worked the injury, that a cargo of teas in such circumstances would have depreciated to that extent.
IV. The legal rights and obligations of the claimants. — The value of the property or of the policies at the time of the sailing of the vessel do not appear to have been in dispute. The title of each claimant also was not questioned. There was no discussion there as to the subrogation of the insurers, or as to the rights of Mr. Hubbell as assignee. It was apparently assumed that the Executive decides in whose name the United States will present international claims, and that its action in this respect cannot be judicially reviewed without authority from Congress.
The statute of1859 required the commissioners to exercise their powers in conformity with the provisions of the claims convention of 1858; and according to the principles of justice; and in accordance with the canons of international laio.
The only provisions of the convention which could affect their proceedings were those relating to the payments into the fund. The commissioners had regard to this in the rate of interest which they fixed as compensation for delays in payment.
The principles of justice, as the phrase is used in the statute, is not a vague sense of equity. Congress had in mind the well-defined distinction between the principles of justice im planted in all men by the Creator, (which commentators on the civil law style the Jus Gentium, or the Jus Naturale), and what'we call International Law, which the Romans termed Jus Fetiale, and which some later writers called the Jus inter Gentes. (Wheaton’s Histoire des Progrés du Droit des Gens, vol. 1, p. 142, 3d ed.; 1 Lawrence’s Commentaire sur Wheaton, 106 $ *606 Maine’s Ancient Law, cb. III; 4 Mommsen’s Rome, 655, American Edition.) Those principles of justice were as capable oí defintion as any known legal principles. For onr purposes it is sufficient to indicate two:
1. In the means by which justice is to be attained, the court is freed from the technical -rules of evidence imposed by the common law, and is permitted to ascertain truth by any method which produces moral conviction. This proposition is self-evident. Evidence, in its narrow and technical sense, is a machine for the discovery of truth, fettered and restrained by municipal law and by local regulations, which vary greatly in different countries. In its- wider and universal sense it embraces all means by which any alleged fact, the truth of which is submitted to examination, may be established or disproved. (1 Green. Ev., § 1.) International tribunals are not bound by local restraints. They always exercise great latitude in such matters (Meade’s Case, 2 C. Cls. R., 271), and give to affidavits and sometimes even to unverified statements the force of depositions. The statute failed to direct the commissioners to administer oaths, not only because they were to arbitrate internationally upon the liability of China, but also because they might have to take the testimony of Chinamen, who were without sense of the responsibility of an oath. They might also be obliged, when proof was lost, to estimate losses from general facts within their own knowledge. Congress gave them the right to do this, so that no one in the little American colony, where the work was to be done, should suffer from technicalities.
2. Complete reciprocity of obligation exists; so that one power is not to be held to the duty of a performance from which the other power under similar circumstances would be released. This proposition is also self-evident. If a duty were unilateral, it could not from its very nature spring out of a rule created by universal and necessarily reciprocal recognition and obligation.
International laio, the third phrase used in the statute, has been often defined by elementary writers. In onr opinion a judicial tribunal can recognize as authoritative only those princi* pies which are either sanctioned by the municipal law of the country or are concurred in by the general practice of nations as expressed by executive or judicial organs. Law, as applied to man or society is a rule for action prescribed by authority. We know of no human authority which can assume to dictate *607 to a sovereign nation except its own municipal laws and its treaties and tbe concurrent practice of tbe great family of nations.
Among tbe principles sanctioned by tbe concurrent consent of nations are two which are pertinent: 1. That a nation should observe its treaties, whether the engagements aré reciprocal or unilateral. 2. That the unwritten obligations which custom imposes on nations in their international dealings are reciprocal. Inter Rationed lato, as well as the principles of justice, recognize the duty of nations to observe the divine maxim, and do unto other powers as it would have them do were the case reversed.
The first question for the commissioners to determine was whether China was internationally responsible for the acts of the pirates. Mr. Eobert McLane, who was the American representative in China when the outrage took place, and who knew the circumstances under which the seizure was made, and the political condition of China, and the strain Avhich the rebellion was making upon her social forces, and who was in the best position to pass judgment on her good faith, advised his government that China was not responsible. The trained capacity of Mr, McLane for diplomacy, and his practical knowledge of the international rights and duties of nations, entitle his opinion to much consideration. Mr. Wells Williams, of whom the same may be said, and Commissioner Bradley were of like opinions. Commissioner Roberts differed from his colleague. Mr. Ward, the minister, to whom they referred their differences, settled the matter by turning to the instructions from the Department of State. Mr. Marcy had instructed Mr. Ward’s predecessor to present the claim diplomatically. This was done in 1855; some years before the conclusion of the claims convention. In so far as the instruction can be construed as an expression of the Secretary’s opinion that China was liable internationally on the facts as we now have them, it was wrong. But Mr. Marcy does not review thefacts, and therefore we cannot judge how far he founded his opinion on ex parte statements which turned out on investigation to be untrue.
Mr. Cass wrote after the conclusion of the convention, and in view of the coming arbitration, and therefore avoided the tone of a categorical instruction. He reviewed the facts as he understood them. They differ materially from those which this court *608 now finds. Mr. Cass said that it was alleged that the local authorities participated in the plunder; that the robbers were known to the authorities; and that the pirates were taken into the imperial service with full knowledge of their Crime. If these facts should be proved, he thought China would be responsible, both under the treaty and according to the law of nations.
That may be so; but in the present findings none of these facts appear, although we were asked to find them. The local authorities had access to the booty and did not restore it; but they may well have been prevented by the overwhelming superiority of the pirates, and, in our opinion, such was the fact. The pirates were driven within the imperial lines by the force sent against them, leaving their plunder behind them. Eventually they became part of the imperial service. We have not found a guilty knowledge and intent in their employment by the government. Their junks may have been, and probably were, captured by the imperial fleet, and the crews may have been, and probably were, forced into the government service. Both Mr. Marcy and Mr. Cass wrote without the light which our own war has thrown upon the inability of the best-disposed government to enforce its will at all points within its jurisdiction during the pendency of a gigantic armed rebellion. Had they written later, they would have hesitated before they committed the United States to such a reclamation.
A nation is not ordinarily esteemed to be liable internationally for injuries done to the property of foreigners within its jurisdiction. If Chinese property is destroyed in California, or a British vessel pillaged by wreckers in Alaska, international responsibility in damages does not necessarily follow. By the comity of nations it is assumed that the civil'power acts in good faith; that its laws in their ordinary operation afford requisite protection; and that if protection fails its courts furnish the means to procure compensation and to punish the wrongdoer. A foreigner who resides within a country is only entitled to enjoy the same protection and the same indemnity which are accorded to the citizens or subjects. (Mr. Webster to Mr. Calderon, November 13,1851.) When the courts of the country are so bad or so corrupt as to excuse resorting to them ; or when all redress through them has failed; or when a despotism affords no protection to natives; or when the injured nation has *609 letermined to question the good faith of the other power, a ease irises for an international reclamation for such a cause.
In China, however, the right of resort to the court and the amount of protection afforded by law to Chinese were nullities as to foreigners. The unilateral treaty provisions concerning protection and indemnity were made to take their place. The findings make no question as to the good faith of China. If China failed in the performance of any engagement to protect or to restore the claimant’s property, the failure was not designed. This does not necessarily relieve China from the consequences of failure, if it occurred, but it may excuse it from responsibility outside of the treaty.
As soon as news of the piracy was received, China contributed its quota of war vessels to a combined expédition to Koelan for the purpose of arresting the pirates, and punishing them according to law, and obtaining possession of the property in order to restore it to its owners. The expedition went to Koelan and broke up the nest of pirates, and drove a portion of them inside the lines of the Chinese fleet in Canton itiver, and restored a portion — unfortunately a very small one — of the property.
Thus far China appears to have willingly performed its duty as well as it could; but it did not return the property. The only express engagement in the treaty related to a partial return of the property, in which case China was not bound to make indemnity for the remainder. The treaty made no provisions respecting a total loss, or respecting indemnity for a partial loss when the failure to return the remainder was occasioned by causes not named in it. As to those cases, China was bound to do what could be required of the United States under like circumstances. If the United States had been pressed by a great rebellion, as China then was, taxing its energies to the utmost, its government would undoubtedly have claimed exemption from liability or blame for not preventing a piracy at a point on its shores beyond the insurgent lines, or for not capturing and returning goods which had been seized and destroyed.
Regarding himself as bound by his instructions, the minister decided that China was liable. The commissioners adopted his conclusion and proceeded to determine how the liability should be measured. On this point they decided, apparently *610 without disagreement, that it was to be measured by tlie value of the property when seized and destroyed. In this they unquestionably did right. It would have been a. mockery of justice to measure the liability by values which the vessel and cargo had lost at sea before arriving in Chinese waters. Congress did not mean to assent to a principle which would require the United States in like circumstances to make good losses occurring before the arrival of ships in American waters, nor did they invite the commissioners to sanction it.
The artificial relations between assurers and assured, which are now invoked to cast responsibility on China, relate only to the rights of parties inter sese. In the case before the commissioners they could not be considered. The insurers insured both against perils of the sea and piracy. They were equally liable for a total loss whether the vessel arrived at Koelan in good condition or injured. As, therefore, the technical rule in regard to the proximate cause of loss could in no event limit the insurer’s liability, it would have been wrong to invoke it simply to enforce upon China a measure of damages unknown to international law.
The protest showed that the property arrived in Koelan badly injured. The owners and insurers were then as they are now in the position of having proved affirmatively that the invoices and policies were untrustworthy as measures of value. The commissioners then either allowed the claimants to produce evidence, or sought themselves for evidence, on these points in the claimants’ interest, which is not in the record or findings. Without such proof they could not have found for the claimants. If they sought it themselves, they acted entirely within the spirit of the statute.
It is said that the evidence of the condition of the property at the time of the seizure was destroyed by the Chinese, and that, therefore, everything should be taken against the spoiler. But the Chinese were not the spoilers. The ravages were made by armed enemies of China, who were cruising in organized fleets sufficiently numerous to bid defiance to the war junks of China and to overawe the local authorities at Koelan.
The commissioners decided that all the claimants, except Boo-ney, were entitled to recover. They next determined that they were entitled to interest. On this point they determined t£to place on record the fact that interest has been allowed to the *611 claimants at tbe liberal rate of 12 per cent, per annum in consideration of tbe circumstance that there will be some delay in making payment of tbe amount awarded.” They did right in allowing interest; but it appears by tbe findings that five per •cent, was tbe rate in China at that time.
Y. The claimants' participation in the former distribution of the fund. — Tbe proved loss on tbe policy, as we have seen, was $5,292.60. Tbe rate of interest proper to be allowed was 5 per cent. Interest was calculated for five years. At that rate tbe amount allowed on tbe vessel should have been $0,615.75. Tbe commissioners actually allowed $15,200. They obtained this amount by adding to 40 per cent, of tbe policy $1,500 spent by tbe underwriters on tbe vessel for salvage, and giving 60 per cent, interest on all. It is plain that they disregarded tbe evidence of tbe experts and audited the loss on tbe vessel on other evidence. Before passing to tbe next items, we take occasion to say that in our opinion the'underwriters on tbe vessel were not entitled to compensation, even on tbe theory of liability adopted by tbe commissioners from Mr. Cass’s instructions. The Chinese were guilty of no violation of tbe treaty in not restoring tbe vessel. Tbe pirates destroyed it and made its return impossible.
Tbe commissioners’ audit of tbe value of tbe cargo at tbe time of tbe seizure is tbe only proof on that point in tbe record. If it bad been stricken out, tbe claimants could have recovered nothing. There is abundant contemporaneous evidence that it was right. Tbe claimants or their representatives in China approved of it. Mr. Ward wrote on this point officially to tbe Secretary of State: “As far as I have been able to learn, every claimant is content with the amount awarded. Such certainly ought to be the fact.” This court has found as a fact that there was no protest, although tbe claimants had ample time to make one. It having been said that some of tbe underwriters bad protested against it, Mr. Wells Williams wrote officially to Mr. Burlingame: “Among tbe papers now on file relating to tbe Caldera, there is no copy of a protest or appeal from Messrs. Bussell & Co., when they received tbe award; nor when I paid them tbe first dividend of $21,950.62 in January, 1860, did I receive a protest, and I have no recollection of bearing of it at any time after that date. Messrs. Alvord & Co., whose claim for losses at tbe same time was decided on tbe same principle, made no appeal against their award.” (2 Dip. Cor. 1865, *612 412.) Some years later some of, the insurance companies attempted to reopen the question diplomatically. They did not then question the facts as found by the commissioners. They rested their claim to a rehearing on the allegation that they had not had time to prepare an argument to cover the case, and that “the board, not being conversant with insurance, did not consider the merits of the marine loss through the protest with full evidence and testimony before them.” (Ib., 410.) When this statement that they had not had time to prepare an argument was submitted to Mr. Wells Williams, he said: “In truth this case was illustrated by more evidence direct and collateral than any other one presented, not only as to the condition of the ship and cargo after the storm, the circumstances of the-several attacks of the pirates, and the disposal of the cargo-after she had been pillaged, but by full arguments in regard to the legal and international features involved in the transaction. * * •* It is always difficult to disprove negative assertions, but in this case I cannot see how the distance or the limited session of the commission operated against the claimants,, for they had a longer notice than they now say would have sufficed, and seem to have fully availed themselves of it.” (Ib., 411.)
YI. The claimants' rights under the act of June 19, 1878. — The grant of power in the act is as follows:
“Any person or persons, or body corporate, holding and making any claim upon the balance of the fund usually designated and known as ‘ the Chinese indemnity fund,’ under the-control of the Department of State of the United States, and now unappropriated, for loss sustained by the plunder and destruction, in the year 1854, of the bark Caldera and property on board of said vessel, may, at any time within twelve months after thepassage of this act, commence proceedings in the United States Court of Claims against the United States, in the same manner as other suits are brought, pursuant to and in virtue of the statutes of the United States and the rules of said court; and that the said Court of Claims shall have full jurisdiction to hear and determine such claim or demand according to the principles of justice and international law.”
The act contemplates proceedings supplementary to those of the commissioners. The powers granted are to be exercised, as were the powers granted to the commissioners, according to the principles of justice and international law. We agree with the majority that the act contemplated the possibility of new *613 claims being presented on account of the Caldera; but we further hold that on its face it applies only to claims not presented and passed upon in Macao in 1859. There is no express warrant for setting aside the results of the former investigation .after their approval by Mr. Ward.
We also agree with the majority that before the passage o f the act of 1878 the action of the board was final and conclusive for all time, and barred a recovery on the merits in this court (Meade’s Case, 9 Wall., 725); but we hold that the bar raised by the award of 1800 is not set aside by the act of 1878, when construed alone and without reference to its legislative history. It authorizes us only to hear and determine claims against the fund. But a demand which has been adjudicated upon and settled and paid is no longer a claim. It has been extinguished and no longer exists.
This very poin t has been decided. In 1866 Congress resolved that the claim of Richard W. Meade be “referred to the Court ■of Claims for adjudication.” (14 Stat. L., 611.) The case came before this court. In its third conclusion of law, this court decided that the resolution “referring back this case after the same had been once decided by the former Court of Claims adversely to the claimant was not a waiver of the said bar, and does not allow this court to adjudge and decide the case upon ■the merits, irrespective of the decision and dismissal by the said commission.” (7 C. Cls. R., 168.) The Supreme Court, passing upon this, said: “We concur also in the third conclusion of law.” (9 Wall., 725.)
In 1869 Congress reopened the commissioners’ decisions as to another claim which had been rejected. They then said “ that the Attome3'r-General be, and he hereby is, directed to examine the claim of Nott & Co., and if in his opinion the said claim ■ought to be paid, he is authorized and instructed to order the same to be paid.” If equally explicit language had been used respecting the present claims, they would have been before us .for adjudication.
When we refer to the legislative history of the act it appears •that Congress did intend to set aside the bar, but only in part and upon conditions. The committee of the Senate and the House committee made identical reports recommending the .passage of this identical act. In that report they said :
“Under an act of Congress, passed in 1859, commissioners were appointed to pass upon all claims upon this Chinese in *614 demnity fund. These commissioners held their sessions at Macao, in China, and to them the papers in the Caldera case were forwarded by Mr. Cass, then Secretary of State. The claim was duly filed with the commissioners, who made a deduction therefrom of 60 per cent., on the ground of a supposed prior damage by sea-water in the cargo. This deduction appears to have been made without sufficient evidence of its justice, and under a misapprehension of the, law applicable to the case, and the claimants had no opportunity of being heard upon the question.
“They were told that the acceptance of tbe 40 per cent, allowed them would not preclude a rehearing of the case at Washington j. but as the act of 1859 did not provide for an appeal from the decision of the commissioners, such a rehearing cannot be had without an act of Congress.
“Your committee are satisfied, from the evidence submitted to-them, that it is but just that the underwriters should be allowed to present the evidence, which, if they had time or proper notice, would have been presented to the commissioners to some competent tribunal for a final decision as to the justice of their claim.”
If this report may be reeeived to show the purpose of the legislature, the act of 1878, 1st, authorized the Court of Claims to inquire whether under the law applicable to the cat e any deduction could be made from the value of the cargo on the ground of damage by sea-water before the liability of China attached; and, 2d, in case of a decision of this point of law adverse to the claimants, then that the claimants should have the right to present here evidence to warrant a reduction of the amount found by the commissioners which was not presented to the commissioners for want of time or proper notice. If no-such evidence should be presented, then the old award was to stand. Congress did not intend to open .the award as to the-40 per cent. It opened it as to the 60 per cent, only for two purposes: 1. The claimants were before Congress as they are before this court and as they were before Mr. Burlingame seventeen years ago, urging that the doctrine respecting proximate cause of loss laid down in Schiefflin v. New York Insurance Company (9 Johns., 28) is applicable to these cases, and that they are entitled to the full value of the ship and cargo, irrespective of sea-damage. Congress authorized them to have the question determined here. We have shown that the doctrine has no application in these cases. 2. The claimants also urged before Congress that they were in possession of evidence which had not *615 been' before the commissioners, and which might have reduced the estimate of the sea-damag’e. The eommitte recommend Congress to say to them, “ Take it before the Court of Claims. If the new proof is what you say it is, that court may hear it and do you justice.”
Even if we may interpolate the qualifying provisions of the report into the statute, and thus modify its clear provisions, we are not authorized to reopen the old issues on the old proof. That was weighed and settled twenty years ago by men in every way competent to settle it, upon competent evidence, some of which is manifestly not in the record. No competent evidence is now offered which was not offered and considered at the former trial. It appears by finding XXXYI that all the proof which the commissioners sent to Washington is before us. Their settlement was accepted and approved by all parties interested at the time it was made. This court has no power on the same evidence to reopen it; and if it had the power the minority of the court would not be disposed to increase the amount then allowed.
Finally, and to recapitulate, we are of opinion, for reasons already given—
1. That the executive and legislative branches of the government .have (each by separate action) indicated an opinion that the Chinese indemnity fund belongs to China, except as to claims for which China was internationally responsible under the provisions of the treaty of 1844 and the claims convention of November, 1848.
2. That China was not internationally liable for the acts of the pirates at Koelan.
3. That if so liable, it was liable only for the value of the property at the time of its seizure by the pirates.
4. That that value was proved to the satisfaction of the commissioners who were authorized to audit it.
5. That their audit.was approved by the diplomatic representative of the United States and became an “award” under the statute of 1859.
6. That in proceedings under the act of 1878 the claimants can refer to that award to prove their title to the property seized and its forcible capture, and that without such reference there is no evidence of title in the record or findings.
*616 7. That the claimants having proved affirmatively that all the property had suffered sea-damage before its arrival at JKoelan, the burden of proof is on them to show the amount of that injury if they rely upon the policies- and invoices as evidences of I value.
8. That the award \s prima facie evidence to prove the value of the property at the time of the seizure, and that it is collaterally supported by other facts in the findings and in official documents printed by order of Congress.
9. That no other evidence as to the value of the property at the time of the seizure being offered by the claimants under the provisions of the act of 1878, the award is conclusive on that point.
10. That the awards which were favorable to the claimants were right as to amounts ; or if there was any error it was in their favor.
11. That the representative of Rooney cannot recover, because China was not responsible for his losses.